**Ira ELFENBEIN et al., Plaintiffs,**

**v.**

**AMERICAN FINANCIAL CORPORATION et al., Defendants.**

**No. 75 Civ. 3595 (HFW).**

United States District Court,
S. D. New York.

April 15, 1980.

620

Kass, Goodkind, Wechsler & Gerstein, New York City, for plaintiffs; Gene Mesh, Gene Mesh Co., L. P. A., Cincinnati, Ohio, of counsel.

Milton Paulson, New York City, Keating, Muething & Klekamp, Cincinnati, Ohio, for defendants; Louis F. Gilligan, Cincinnati, Ohio, of counsel.

## OPINION

WERKER, District Judge.

Plaintiffs[1] commenced this class action against defendants[2] alleging, *inter alia*, violations of sections 11(a) and 12(2) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k(a) and 77*l*(2), respectively; sections 10(b) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78n(a) as well as Rules 10b–5 and 14a–9 promulgated thereunder, 17 C.F.R. 240.10b–5, 14a–9, together with a pendent claim for alleged breach of fiduciary duties under state law arising out of the short-form merger of National General Corporation ("National") into American Financial Corporation ("Financial") on March 14, 1974.

Having agreed that the issues of liability do not involve factual disputes, the parties have cross-moved for summary judgment pursuant to Fed.R.Civ.P. 56(a) and (b).

## FACTS

Pursuant to a purchase agreement dated October 21, 1972, as amended on December 6, 1972, Financial contracted with a group of National shareholders, consisting in part of former officers and directors of National, (the "Schulman-Weintraub Group") to purchase 675,000 shares of National common stock. The agreements provided that Financial would pay for the stock partly in cash and the remainder by promissory notes delivered to the sellers. The agreement further provided that upon the closing Financial "will receive title to the National stock it is purchasing from each of the Sellers free and clear of encumbrances."

Exh. 2 at 4. Additionally, under the terms of the agreement, all dividends payable on National's common stock were payable to Financial and Financial was entitled to voting rights as long as it was not in default under the terms of the promissory notes. The notes also provided for acceleration in the event of Financial's default.

At the closing, Financial made the required cash payment and executed and delivered the promissory notes; the Schulman-Weintraub Group delivered to Financial the purchased shares which were then registered in the name of Financial on the books of National. Financial pledged the shares as security for the promissory notes and delivered the shares to the Bank of America as escrow agent.

In January 1973, Financial entered into an agreement with certain officers and directors of National (the "Klein-Schwartz Group") to purchase 903,357 shares of National common stock in return for the payment of cash and delivery of Financial securities. Under the agreement Financial was obligated to make an identical offer to all other holders of National's common stock. Pursuant to that exchange offer, Financial acquired 6,658,000 shares of the common stock of National. Assuming Financial was the owner of the 675,000 shares of National common stock previously purchased from the Schulman-Weintraub Group, Financial was then the owner of approximately 94% of National's outstanding common stock.

On December 3, 1973, Financial filed a preliminary prospectus relating to a proposed merger of National into Financial. Upon learning of the intended merger, the members of the Schulman-Weintraub

1. Plaintiff Elfenbein commenced suit on behalf of all public stockholders and holders of 4% convertible debentures of National General Corporation ("National") on March 14, 1974 who exchanged their securities for 9½% convertible debentures of American Financial Corporation ("Financial"). Elfenbein's motion to maintain the suit as a class action was granted in the spring of 1976. Another class action, *Chekares* and *American Financial Corp.*, 76 Civ. 2377, was instituted subsequent to the Elfenbein suit on behalf of those public holders, on March 14, 1974, of warrants of National convertible prior to November 1, 1978 into National common stock at the rate of $40 per share. Since the alleged wrongs in both complaints were identical, the *Chekares* and *Elfenbein* actions were consolidated for all purposes on April 1, 1977.

2. The defendants are Financial and the individual defendants who were officers and directors of both National and Financial at the time of the merger. National had six directors—the five individual defendants herein and one Stanley Zak.

Group notified Financial of their objection to the merger. They advised Financial that it was in default under the notes and the pledge agreement since the proposed merger would destroy their collateral, i. e., the National common stock, which would cease to exist after the merger. Nevertheless, on March 11, 1974, the directors of Financial and National approved the terms of a short-form merger of National into Financial. On March 13, 1974, Financial exercised warrants it held for the purchase of 7,790,704 shares of National common stock. The following day, the merger of National into Financial allegedly became effective pursuant to the provisions of Ohio Revised Code Section 1701.80 and section 253 of the Delaware Corporation Law [3] under which a minimum of 90 percent stock ownership in the subsidiary by the parent corporation is required to effect a statutory short-form merger.

Two weeks after the merger, each member of the Schulman-Weintraub Group wrote identical letters to Financial asserting that Financial, as the owner of the pledged National common stock was "obligated to exercise the appraisal rights accorded to [Financial] . . . and to deliver the amounts received therefrom into the pledge." The letters further advised that failure to exercise the appraisal rights would be regarded as a breach of the pledge agreement. Exhs. 20–23.

On April 5, 1974, Financial requested the Bank of America as escrow agent to deliver the National shares held by it in exchange for Financial's 9½% debentures, pursuant to the plan of merger. Exh. 25. The Bank of America would not release the pledged stock without authorization from the Schulman-Weintraub Group. That request for authorization was denied. The group. asserted that the merger accelerated the payment date of the notes secured by the National stock and that in view of the ongoing controversy, it would be inappropriate to deliver the securities to Financial. Exh. 27.

In February 1975 certain members of the Schulman-Weintraub Group brought an action against Financial and certain individual defendants in this action in the United States District Court for the Central District of California seeking damages for Financial's refusal to exercise its appraisal rights with respect to the shares of National common stock pledged as security, acceleration of the payment of the notes, specific performance of the agreement between Financial and the Schulman-Weintraub Group, the imposition of a trust on the assets of National and an injunction enjoining the defendants from transferring any of National's assets. That action was subsequently settled upon the substitution by Financial of other collateral as security for Financial's promissory notes.

The action now pending before this court was commenced in July 1975 on behalf of the stockholders of National who tendered their shares in exchange for 9½% debentures of Financial pursuant to the terms of the merger and was consolidated in April 1977 with another class action alleging the same wrongs.[4]

The gravamen of the amended consolidated complaint is that defendants violated the anti-fraud provisions of the federal securities laws in that the merger prospectus was materially false and misleading. However, by agreement of the parties, only two issues relating to liability remain to be determined by the court as a matter of law: (1) whether Financial owned 90 percent or more of the stock of National on the date of merger; and (2) whether Financial unlawfully failed to disclose a possible tax liability to National resulting from a lapse or extinguishment of the warrants owned by Financial.

## OWNERSHIP

Plaintiffs contend that Financial improperly represented in the merger prospectus that it had the requisite 90 percent ownership of National common stock to effect a

---

**3.** Financial is an Ohio corporation; National was incorporated under the laws of Delaware.

**4.** See note 1 *supra*.

statutory short-form merger under Delaware corporate law.[5] The court disagrees.

Section 253 of the Delaware Corporation Law, permits a parent corporation owning at least 90 percent of the stock of a subsidiary to merge with the subsidiary upon approval by the parent's board of directors. The vote of the stockholders of the subsidiary is not required. Plaintiffs refute the ownership Financial allegedly acquired by both the Schulman-Weintraub acquisition and the exercise of warrants one day prior to the merger. For the reasons given below, the court finds that Financial was the owner of both groups of shares which together with its prior holdings gave it ownership of approximately 97 percent of the outstanding stock of National, and therefore, the right to effect a short-form merger under Delaware law.

*The Schulman-Weintraub Group Stock*

As of the date of merger, 571,000 shares of the Schulman-Weintraub Group stock, which originally involved 675,000 shares, were still held in pledge by the pledgeholder, Bank of America.[6] The minority shareholders of National at the date of merger were the owners of 525,000 shares of common stock. Adding these shares to the 571,000 shares still held in pledge yields a total of 1,096,000 shares which represents more than 10 percent of National common.[7] Plaintiffs dispute Financial's ownership of the Schulman-Weintraub shares and therefore charge defendants with violating the federal securities laws by failing to disclose the lack of requisite 90 percent ownership in the merger prospectus.

■ Plaintiffs assert that "ownership" as used in the Delaware Corporation Law to effect a short-form merger must encompass beneficial as well as record ownership and since Financial lacked the necessary beneficial ownership of the 571,000 shares which were being held by the pledgeholder, it was not the "owner" of those shares. The court finds that record ownership is sufficient to effect a short-form merger under Delaware law thereby vesting Financial with approximately 94 percent ownership in National's common stock by its acquisition of the Schulman-Weintraub Group shares. Moreover, Financial made adequate disclosure in the merger prospectus with respect to the controversy surrounding the Schulman-Weintraub claim.

As noted above, the pledge agreement between Financial and the Schulman-Weintraub Group expressly provided that title to the National shares passed to Financial on the closing date.

■ The agreement did not affect Financial's ownership of the property since the general property right remains in the pledgor-owner, and the pledgee does not acquire an interest in the property except as security for the debt. *Tracy v. Stock Assur. Bureau,* 132 Cal.App. 573, 23 P.2d 41, 43 (4th Dist.1933).[8] Furthermore, plaintiff's contention that the record ownership is not sufficient to enable Financial to effect a short-form merger is conclusory, unsupported and in direct contradiction to section 262 of the Delaware Corporation Law relating to appraisal rights upon merger which provides that "the word 'stockholder' means a holder of record of stock." *See Olivetti v.*

---

5. The Delaware and Ohio short-form statutes are substantially similar; therefore, any references to the applicable law with respect to the merger will be to Delaware Corporate Law.

6. The other 104,000 shares were released to Financial by the escrow agent, Bank of America, when Financial paid the January 10, 1974 installment note. The pledge agreement provided for eight installment notes, one each payable annually on January 10 in the years 1974 through 1981. Upon payment of each note, 12½% of the pledged stock was to be delivered and released to Financial by the pledgeholder.

7. On March 13, 1974, prior to the loan-warrant transaction discussed in text, *infra,* there were 8.2 million National shares. Any shares in excess of 820,000 not owned by Financial would exceed 10% and Financial would therefore not own the minimum 90%.

8. The pledge agreement provides that its interpretation and enforcement are to be governed by the laws of California. Exh. 5 at 9.

*Jacques Coe & Co.*, 42 Del.Ch. 588, 217 A.2d 683, 686 (1966) (record ownership alone is sufficient to support short-form merger).

Similarly specious is plaintiffs' contention that as the result of an alleged default by Financial under the terms of the pledge agreement Financial was divested of the Schulman-Weintraub shares. The sole reference to "default" in the pledge agreement relates to a default "under the terms of the notes." Exh. 5 at 2, 5. No claim is made that Financial defaulted in the payment of any of its notes given in payment for the Schulman-Weintraub shares, but rather that the merger itself constituted the default because it destroyed the collateral security for Financial's unpaid notes, i.e., the National stock. However, since the pledge agreement itself expressly made provision for a possible merger of National with "any other corporation" the parties could not have intended that a merger would constitute a default. A possible future merger was anticipated and authorized by the express terms of the pledge agreement.[9] This authorization to merge with "any other corporation" does not exclude a merger with Financial as plaintiffs assert. Had the parties so intended, the language of the agreement would have reflected that plan.

Plaintiffs seek further support for their claim that Financial was in default by arguing that Financial warranted to the Schulman-Weintraub Group that it had no intention of making any tender offer for additional stock. Plaintiffs' brief at 19. This assertion however, is a further distortion of the language of the agreement which explicitly provided that Financial had "no *present* intention to make any tender offer," (emphasis supplied) and it was not until more than one year after the pledge agreement was executed that the merger was approved.

Furthermore, upon the merger there was a substitution rather than a destruction of the collateral for Financial's promissory notes since Financial's 9½% debentures were offered in exchange for National's common stock.

Finally, spurred by a concern that as a result of the merger Financial's debentures would be substituted as collateral for Financial's promissory notes, members of the Schulman-Weintraub Group demanded that as a National stockholder, Financial exercise its appraisal rights pursuant to section 253 of the Delaware Corporation Law. Exhs. 20–23. It is clear that this position is inconsistent with plaintiffs' claim that the Schulman-Weintraub Group contested Financial's ownership of the National stock purchased from them. Moreover, the allegation by the Schulman-Weintraub Group was not that Financial was not the owner of these securities, but rather that a default had occurred in the pledge agreement which accelerated the payment of the notes since the collateral for Financial's notes no longer existed after the merger. In addition, the merger prospectus contained adequate disclosure with regard to the controversy surrounding the Schulman-Weintraub claim.[10] Consequently, plaintiffs' claim with respect to this aspect of the contested requisite ownership needed to effect a short-form merger is meritless.

### Loan-Warrant Transaction

Plaintiffs contend that Financial could not have achieved 90 percent ownership by the exercise of the warrants it owned to purchase, with borrowed funds, 7,970,704 shares of the stock of National at a cost of approximately $318,000,000 since this transaction was a "sham", and therefore did not vest title to the shares in Financial.

---

9. The pledge agreement provided that "in the event of a merger or consolidation of National with . . . any other corporation . . . any securities of such other corporation . . issued in exchange for the securities of National which are in Pledge . . . shall be delivered by [Financial] to and held by the Pledge Holder in pledge subject to all of the terms and conditions hereof." Exh. 5, 2–3.

10. The prospectus states that "AFC has been advised that the sellers contend that the notes have been accelerated because of the Merger. AFC does not concur in this position and the controversy has not been resolved." Exh. 1 at 30.

Financial originally acquired most of the warrants it held pursuant to a tender offer in January 1973 at a cost of over $46,000,000. Under the terms of the warrants, Financial had the absolute right, until September 30, 1978, to exercise the warrants and to purchase for each warrant exercised a share of National's common stock at $40 per share.

On March 13, 1974, Financial exercised the warrants by borrowing the entire purchase price from the First National Bank of Boston. National guaranteed the loan, invested the funds received from Financial in the United States Government obligations and secured its guarantee with those obligations.

Plaintiffs argue that this loan-warrant transaction was a "sham" and a "manipulation" in that it had no "real economic substance." Defendants challenge this argument by asserting that the transaction was effected pursuant to expert advice for the purpose of eliminating a possible tax liability and was therefore intended to serve the interests of both National and Financial. The court agrees.

Prior to the merger, Financial had been advised by its tax experts that the effect of the merger with National would be to extinguish the warrants it held on National common stock. Financial was further advised of the existence of a pending case in which the I.R.S. took the position that the amount paid to a corporation for warrants it had issued and which had lapsed constituted taxable income to that corporation. Exhs. 12–14. Financial was therefore advised that it could remove the possibility of any tax liability being assessed against National and which would ultimately become Financial's liability upon merger, by exercising the warrants it owned in National's stock. Since the ultimate possible tax exposure was calculated to be $80,000,000, as a matter of business judgment, Financial elected to accept the advice of its tax counsel and to exercise the warrants in an effort to avoid the possible imposition of a tax.

Plaintiffs' objection to the impropriety of the exercise of the warrants by Financial apparently rests on the fact that Financial borrowed the $318,000,000 needed to exercise the warrants. This position is untenable, however, since Financial's election to borrow the needed funds as a matter of business judgment did not affect its ownership of the National shares upon the exercise of the warrants. To assert that when National guaranteed the loan it became ultimately liable therefor, rendering Financial's payment only conditional and therefore in violation of the Delaware Constitution which mandates that a corporation may not issue stock except for money actually paid is meaningless.

First, upon the exercise of the warrants, Financial paid National with the proceeds of the loan it secured from the First National Bank of Boston. National's guarantee of that loan could not have clouded Financial's ownership of the stock acquired from National since Financial was primarily responsible for that loan. Furthermore, the day immediately following the exercise of the warrants by Financial, National ceased to exist as an independent entity by reason of its merger into Financial and the fully secured loan of $318,000,000 guaranteed by National became a debt of Financial, the surviving corporation.

Plaintiffs seek further support for their position that Financial could not have become the owner of 7,970,704 shares of National stock via the loan-warrant transaction by asserting that the National stock was issued for an unlawful purpose, to wit, either to evade federal income taxes or to reduce National's book value from $49.67 to $44.91 per share. For the reasons set forth below, the court finds that this argument is likewise without merit.

Having found that Financial had the requisite 90 percent ownership in National on March 14, 1974 in order to effect the statutory short-form merger of National into Financial, the court now turns to plaintiffs' argument that Financial's failure to disclose a possible tax liability of National was in violation of the federal securities laws.

## FAILURE TO DISCLOSE NATIONAL'S POSSIBLE TAX LIABILITY

[3] Plaintiffs contend that Financial failed to disclose in the merger prospectus the true purpose for which it exercised the National warrants which they claim was to (a) avoid a tax liability of $80,000,000 which if assessed by the I.R.S. would have had a material impact on National shareholders, or (b) to reduce the book value of National so as to decrease the amount its stockholders would receive if they exercised their appraisal rights upon merger.

The court cannot agree that Financial's failure to disclose a possible tax liability rises to the level of a material misrepresentation or omission which would subject Financial to liability under the federal securities laws.

Plaintiffs seek relief under sections 11(a) and 12(2) of the Securities Act[11] which provide for civil liability for misstatements and omissions in a prospectus or a registration statement. Plaintiffs also assert a cause of action under section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder which make it unlawful to make any untrue statement of a material fact in connection with the purchase or sale of any security.[12]

■ The keystone of the entire legislative scheme of the securities laws is disclosure. *See generally Feit v. Leasco*, 332 F.Supp. 544 (E.D.N.Y.1971). The standard under sections 11 and 12(2) of the Securities Act is much less onerous than that required under section 10(b) of the Exchange Act. Plaintiffs need only demonstrate that the registration statement or prospectus was materially false and misleading without proving scienter for the imposition of liability under sections 11 and 12(2) of the Securities Act. *Franklin Savings Bank v. Levy*, 551 F.2d 521, 526–27 (2d Cir. 1977); *Barnes v. Osofsky*, 373 F.2d 269, 272 (2d Cir. 1967); *Unicorn Field, Inc. v. Cannon Group, Inc.*, 60 F.R.D. 217, 226–27 (S.D.N.Y.1973).

The Supreme Court in *TSC Industries, Inc. v. Northway*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), in construing section 14(a) of the Exchange Act, articulated the standard for determining materi-

---

11. Section 11(a) of the Securities Act provides in pertinent part:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue—
[five categories of persons therein named].
Section 12(2) of the Securities Act provides:
Any person who
(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

12. Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) to employ any device, scheme or artifice to defraud,
(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase of sale of any security.

ality as "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 449, 96 S.Ct. at 2132.

■ Similarly, a fact has been deemed material under sections 11 and 12(2) of the Securities Act when an investor would attach importance to it in making an investment decision. *Feit v. Leasco,* 332 F.Supp. at 571 (§ 11); *University Hill Foundation v. Goldman Sachs & Co.,* 422 F.Supp. 879, 904–05 (S.D.N.Y.1976) (§ 12(2)).

Plaintiffs claim that not only did defendants know of a contingent $80,000,000 tax liability and therefore entered into the loan-warrant transaction to avoid it, but also that defendants knew that the I.R.S. might consider the transaction a sham and nevertheless impose liability, and it was this potential liability that defendants unlawfully failed to disclose. Plaintiffs further contend that defendants concealed a second reason for the loan-warrant transaction, i.e., that it would reduce the book value of National common stock by approximately $5.00 and thereby dilute the appraisal rights of National's stockholders. To complete the argument, in order to satisfy the materiality test, plaintiffs assert that had National stockholders known of this potential liability and the intentional dilution of National's book value, that information would have been considered by them in determining whether to exercise their appraisal rights or accept Financial's 9½% debentures under the terms of the merger.

The court finds that the failure to disclose the purpose of the loan-warrant transaction is immaterial. Disclosure of a possible tax liability would not have influenced a reasonable shareholder to seek appraisal rather than accept the merger proposal since a contingent liability in the magnitude of $80,000,000 would have substantially depreciated the value of National's shares and have been an inducement to the stockholders to elect to accept the terms of the merger which provided for an exchange of National shares for Financial's 9½% deben-

tures. In short, the non-disclosure of National's possible tax liability was not a causal link which induced the National shareholders to accept the merger terms. *See Weisberg v. Coastal States Gas Corp.,* 609 F.2d 650, 653–54 (2d Cir. 1979).

Plaintiffs' claim that Financial failed to disclose that the alleged purpose of the loan-warrant transaction was to reduce the book value of National's shares is belied by explicit language in the merger prospectus which sets forth the effect of the warrant exercise on the book value of National shares and the precise amount of the resulting reduction. Exh. 1 at 22.

Moreover, as a matter of business judgment Financial elected to accept the advice of its tax advisers and exercise the warrants thereby avoiding any potential tax liability to National which would ultimately be borne by Financial as the surviving corporation upon merger.

■ The responsibility for the management of a corporation is vested in its directors who stand in a fiduciary relation to the corporation and its shareholders. This fiduciary duty requires that the directors act in good faith and in the best interests of the corporation in carrying out its business. The "business judgment" doctrine bars judicial inquiry into actions of directors taken in good faith and in honest pursuit of the legitimate purpose of the corporation. *See Burks v. Lasker,* 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979); *Galef v. J. A. Alexander,* 615 F.2d 51, 57 (2d Cir. 1980); 3A Fletcher, Cyclopedia Corporations, § 1039 (perm. ed. 1975).

■ As stated above, prior to the merger, Financial had been advised by one of its tax experts that in a case pending before the Tax Court, the I.R.S. had taken the position that upon the expiration of warrants unexercised, the issuing corporation would recognize ordinary income in the amount received upon their issuance and that if the I.R.S. should ultimately prevail in that case, Financial as the successor corporation would be subject to a $80,000,000 tax. Financial was cautioned, however, that if Fi-

nancial exercised the warrants with borrowed funds to avoid the tax, the I.R.S. might consider the transaction a subterfuge and rule that the tax liability remained. Financial's tax advisor nevertheless recommended that Financial exercise the warrants prior to the merger in order to avoid the possibility of any tax being assessed against National. Exh. 12 at 7. Financial received two other opinions which concluded that there was little likelihood of any tax liability being assessed even if the warrants were permitted to lapse since in their view, the taxpayer had a better chance of success in the case pending before the Tax Court. Exhs. 13–14.

Based on the foregoing advice, Financial elected to exercise the warrants.

Plaintiffs seek to avoid the invocation of the business judgment doctrine by equating Financial's future to disclose the existence of a possible tax liability with cases in which corporate officers concealed immoral or illegal conduct. *See, e. g., S.E.C. v. Jos. Schlitz Brewing Co.*, 452 F.Supp. 824 (E.D. Wis.1978); *Cooke v. Teleprompter Corp.*, 334 F.Supp. 467 (S.D.N.Y.1971). The court finds however that Financial's attempt to avoid the imposition of a possible tax liability of $80,000,000 was a legitimate course of action and, applying the business judgment doctrine, it will not second-guess the action taken by Financial's directors.

The court, having found no violation by defendants of section 11 or 12(2) of the Securities Act, need not consider plaintiffs' claim of liability under section 10(b) and Rule 10b–5 thereunder since as noted above, the standard for establishing a violation under section 10(b) is more onerous with the additional requirement of proof of scienter.

Finally, the court will not consider plaintiffs' state court claim of alleged breach of fiduciary duties under the doctrine of pendent jurisdiction since plaintiffs have failed to state a federal claim. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Accordingly, plaintiffs' motion for summary judgment is denied; defendants' motion for summary judgment is granted.

The complaint is hereby dismissed. Submit judgment on notice within 10 days after entry of this decision.

SO ORDERED.