**Joel KRONFELD, Plaintiff–Appellant,**

v.

**TRANS WORLD AIRLINES, INC.;
Transworld Corporation,
Defendants–Appellees.**

**No. 32, Docket 86–7330.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 17, 1986.

Decided Nov. 2, 1987.

As Amended on Denial of Rehearing
Dec. 28, 1987.

Stanley M. Grossman, New York City (Pomerantz Levy Haudek Block & Grossman, New York City, of counsel, Shaheen Rushd, on the brief), Harvey Greenfield, New York City, for plaintiff-appellant Joel Kronfeld.

Robert Sisk, New York City (Hughes Hubbard & Reed, New York City, of counsel, Norman C. Kleinberg, Rebecca Northey, Bradley J. Andreozzi, on the brief), for defendant-appellee Transworld Corp.

Dennis J. Block, New York City (Weil, Gotshal & Manges, New York City, of counsel, Dushica D. Babich, on the brief), for defendant-appellee TransWorld Airlines, Inc.

Before OAKES, MINER and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

This appeal brings up for review a judgment of the United States District Court for the Southern District of New York (Ed-

ward Weinfeld, Judge) granting defendants' motion for summary judgment and dismissing plaintiff's complaint. The district court's decision is reported at 631 F.Supp. 1259 (S.D.N.Y.1986). Plaintiff Kronfeld, suing on behalf of a class of purchasers of cumulative convertible preferred stock offered by defendant Trans World Airlines, Inc. ("TWA") on July 29, 1983, alleged violations of Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"); [1] Rule 10b–5 promulgated thereunder; [2] and Section 11 of the Securities Act of 1933 (the "1933 Act"). [3] We find merit in plaintiff's contentions on appeal, and accordingly reverse the judgment appealed from and remand for further proceedings.

## I. BACKGROUND

TWA became a wholly-owned subsidiary of defendant Transworld Corporation ("TWC") on January 1, 1979 pursuant to a plan of reorganization. [4] By late 1982, TWC had five major subsidiaries: TWA, Canteen Corp., Century 21 Real Estate Corp., Hilton International Co. and Spartan Food Systems, Inc. At that time, TWA was a poor financial performer, having suffered large losses in previous years. Future losses were predicted.

In late 1982 and early 1983, Odyssey Partners ("Odyssey"), an investment partnership with substantial holdings in TWC, proposed to TWC's management a "disaggregation" of TWC's subsidiaries. Odyssey contended that the securities of the separated subsidiaries would trade at a premium over the then-trading value of the parent's securities, largely because, in Odyssey's opinion, the poor financial health of TWA was tarnishing the market performance of TWC securities.

Odyssey's discussions with TWC's management were not fruitful; Odyssey therefore took its case to TWC's stockholders by soliciting proxies in favor of a proposal requesting TWC's board of directors to develop and implement a program whereby TWC's primary subsidiaries would be spun off to form independently traded public corporations. [5]

TWC retained Goldman, Sachs & Co. ("Goldman Sachs") to aid in meeting Odyssey's challenge. Goldman Sachs's ultimate criticism of Odyssey's financial projections was used by TWC in its opposition to Odyssey's proposal. At that time, TWC also asked Goldman Sachs to review the "structural and financial alternatives" available to TWC and to report its findings to the latter's board of directors "well ahead of the August 31 date specified in the Odyssey Proposal." TWC Proxy Statement dated March 24, 1983, p. 19. The retention and assignment of Goldman Sachs were disclosed in a proxy statement issued to TWC shareholders on March 24, 1983, as well as in full-page advertisements in the *Wall Street Journal* (April 14, 1983) and *New York Times* (April 15, 1983), and articles in *Newsweek* (May 2, 1983) and *Fortune* (June 13, 1983) magazines.

The Odyssey proposal was rejected by TWC's shareholders at their annual meeting on April 27, 1983 following a bitter, well publicized proxy fight, although 23% of the vote favored the proposal, and substantial institutional holders of TWC's common stock, while supporting management, were sympathetic to or perceived merit in the Odyssey proposal. Goldman Sachs continued its review of TWC's structural and financial options. At the May 25, 1983 meeting of TWC's board of directors, Frank L. Salizonni, senior vice president for finance and administration of TWC,

---

1. 15 U.S.C. § 78j(b) (1982).

2. 17 C.F.R. § 240.10b–5 (1987).

3. 15 U.S.C. § 77k (1982).

4. On November 30, 1982, a series of TWA cumulative preferred stock was sold to the public. In March, 1983, TWA and TWC offered a total of 6,000,000 shares of TWA common stock to the public, reducing TWC's ownership of TWA's common stock from 100 percent to 81.3 percent. TWC retained 95.4% of the votes for the election of TWA directors as a result of its holding of certain TWA Preference Stock, in addition to its holdings of TWA common stock.

5. In the alternative, the proxy resolution recommended a sale of "some of the primary subsidiaries...." 631 F.Supp. at 1260 n. 3.

stated that a report from Goldman Sacks "would likely be ready for submission to the Board in July." [6]  According to defense witnesses, however, Goldman Sachs's progress as of late June indicated that an adequate presentation would not be ready for the July meeting.  A special meeting of TWC's Board was therefore scheduled for September 6, 1983, at which time Goldman Sachs was to present the results of its review.

As these events unfolded, TWA's financial losses continued.  By May or early June, 1983, TWA considered the possibility of a public offering, having been advised that market conditions were favorable for an issuance of stock.[7]  On July 7, 1983, the TWA board of directors authorized the stock offering which is the subject of this litigation.  On July 29, 1983, TWA filed a registration statement with the Securities and Exchange Commission and issued a prospectus for the offering of four million shares of cumulative convertible preferred stock at an initial price of $25 per share.

The prospectus included a section set off by the heading "RELATIONSHIP BE-TWEEN TWA AND [TWC]," which contained the following statement:

There may in the future be other arrangements between TWA and [TWC] (or other of its subsidiaries).  It is intended that the terms of these arrangements will be determined on an arms-length basis.  There can be no assurance, however, that these terms will be favorable to TWA or that [TWC] will continue to provide TWA with the same level of support for TWA's financing and other needs as it has in the past.

631 F.Supp. at 1261.  This section of the prospectus went on to detail various relationships between TWA and TWC under the headings Financial Relationships, Guarantees, Benefit Plans, Corporate Expenses and Federal Taxes.

The immediately preceding section of the prospectus, headed "CONTROL BY [TWC]," included the following statement:

As TWA must obtain the consent of its lenders to set aside Common Stock into which the Convertible Preferred Stock can be converted, consents have been obtained to allow the creation of up to a 40% public holding in Common Stock. TWA and [TWC] may from time to time issue or sell or otherwise dispose of shares of Common Stock as a result of which the outside ownership of Common Stock could be increased to an amount in excess of 40%, assuming any required consent of lenders and stockholders of the two companies is obtained.

The prospectus made no mention of the ongoing Goldman Sachs study.

At a meeting on July 7, 1987 between representatives of TWC and Goldman Sachs respecting the Goldman Sachs study, Mary Ann Casati, a Goldman Sachs associate, took notes which included, under a heading "2 AIRLINE SALE/SPINOFF," the statement "*primary*-goal-build liquidity in airline & cut cord w/TWC so they can walk away" (emphasis in original); and in the margin on the same page, "TILL DEATH DO US PART."

As planned, Goldman Sachs presented the results of its study to TWC's Board of Directors on September 6, 1983.  Seven alternatives were submitted to the Board for its consideration: (1) liquidation of TWC through a sale of each of its subsidiaries to the highest bidder with a spinoff to shareholders of subsidiaries that could not be sold for a premium over public market values; (2) sale of TWC; (3) partial liquidation, through sale of TWA or other subsidiaries; (4) additional public sales of TWA shares; (5) public sale of 20% of a "hospitality company" composed of non-airline subsidiaries; (6) separation of TWC and TWA by a spinoff of the airline or a rights offering to TWA shareholders;  and (7)

---

**6.** The minutes of the TWC board of directors meeting on June 22, 1983 state that Mr. Salizonni "reported on the progress of the Goldman Sachs report on the corporate structure and the likely completion date thereof."

**7.** TWC's ability to transfer all or any portion of the capital stock of TWA and TWA's ability to issue any of its capital stock were subject to the consent of certain of their lenders.

maintenance of the *status quo*. Goldman Sachs did not recommend adoption of any particular alternative.

Following the September 6, 1983 presentation, TWC's board of directors referred the matter to its finance committee. The Committee met twice, with other board members attending; on September 27, 1983, it unanimously recommended that the board of directors authorize development of a "detailed program for a possible separation of TWA from TWC." TWC's Board adopted the proposal on September 28, 1983. At the same time, public announcement was made that TWC was "considering the possible separation of TWA," and had "instructed management to develop a detailed program under which [TWC's] 81 percent common stock holdings in [TWA] would be distributed to [TWC's] common stock holders, establishing TWA as a separate, publicly owned company." The announcement added that TWC's board of directors was giving this proposal "its most careful consideration," and would seek stockholder approval "if it votes to proceed with a separation plan ..." TWC's Board formally adopted a plan of separation on October 26, 1983. The plan received shareholder approval on December 28, 1983 and was effectuated on February 1, 1984.

Following TWC's September 28, 1983 announcement that it was "considering" the separation of TWA, the market price of the stock purchased by plaintiff dropped markedly. The Joint Appendix submitted by the parties shows a 23.8% decline between September 20, 1983 and October 3, 1983.

In his complaint dated November 29, 1983, Kronfeld alleged that the registration statement and prospectus issued in connection with the July 29, 1983 offering were misleading in that they allegedly failed to disclose material "information regarding [TWC's] consideration of a plan to completely spinoff its TWA subsidiary." Plaintiff further alleged that the offering documents failed to mention the impending Goldman Sachs report, even though "at the time of the July 29, 1983 offering, Goldman Sachs was preparing to recommend to [TWC] the spinoff of TWA."

Additional factual matters are stated hereinafter where pertinent to our ensuing consideration of the legal issues presented.

Defendants moved for summary judgment. The district court found, based on the undisputed facts and the inferences plaintiff could draw therefrom, that as of the date the offering materials were issued, there had been no "final corporate determination[ ]" to separate TWA from its parent. 631 F.Supp. at 1264. Whatever may have been the views of TWC's individual directors respecting separation as an alternative, the district court held that such views need not be disclosed "prior to definitive action by the Board." *Id.* Defendants' motion for summary judgment was accordingly granted.

Plaintiff's primary contention on appeal is that the district court failed to follow the law of this circuit respecting the materiality of prospective events, but instead relied on inapplicable precedents.[8]

---

**8.** Plaintiff also claims the district court erred in holding that defendants had no "duty to disclose" the allegedly material facts. His reference is to the following passage in the district court's opinion: "[m]ateriality vel non is a mixed question of law and fact, which should ordinarily be determined by the fact-finder upon the trial, but the issue of materiality arises only with respect to facts as to which there was a duty to disclose." 631 F.Supp. at 1263 (footnote omitted). This language might be taken to mean that the district court followed a two-step analysis under Section 11 of the Act—one focusing first upon duty to disclose and thereafter on materiality. This approach is followed in the Section 10(b)/Rule 10b–5 area under the 1934 Act. *See, e.g., Chiarella v. United States,* 445 U.S. 222, 229, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980); *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 10–13 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984): *Staffin v. Greenberg,* 672 F.2d 1196, 1202 (3d Cir.1982). But it finds no support in the language of Section 11 of the 1933 Act, or in the few cases which have interpreted it. Section 11 of the 1933 Act provides an express civil remedy to one acquiring a security issued in connection with a registration statement "contain[ing] an untrue statement of a material fact or omitt[ing] to state a material fact required to be stated therein or necessary to make the statements therein not misleading...." 15 U.S.C. § 77k (1982). As the Supreme Court has stated:

If a plaintiff purchased a security issued pursuant to a registration statement, he need only

## II. DISCUSSION

### A. *Standard of Review*

■ Fed.R.Civ.P. 56(c) provides that a court to which a motion for summary judgment is addressed shall grant the motion if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." On appeal from the grant of a summary judgment motion, the same standard is applied by the reviewing court, and the record must be read in the light most favorable to the party against whom summary judgment was granted. *Burtnieks v. City of New York,* 716 F.2d 982, 985–86 (2d Cir. 1983); 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2716 (2d ed. 1983). Further, we must determine whether the substantive law was correctly applied, for the identification of material facts for summary judgment purposes "rests on the substantive law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Here, because we are persuaded that the wrong legal standard was applied on defendants' motion for summary judgment, and in view of the strong showing which generally must be made to justify resolving the question of materiality under the securities laws by way of Rule 56,[9] as the district court acknowledged, 631 F.Supp. at 1263, we reverse.

### B. *Materiality Under Section 11*

1) The Standard of Materiality.

In *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the Supreme Court defined an omitted "material" fact in the proxy context[10] as one posing "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.* at 449, 96 S.Ct. at 2132.[11]

The materiality standard of *Northway* has been applied in this circuit under Section 11 of the 1933 Act. *See, e.g., Akerman v. Oryx Communications, Inc.,* 609 F.Supp. 363, 367 (S.D.N.Y.1984), aff'd, 810 F.2d 336 (2d Cir.1987); *Elfenbein v. American Fin. Corp.,* 487 F.Supp. 619, 626–27 (S.D.N.Y.1980), aff'd mem., 652 F.2d 53 (2d Cir.1981); *Greenapple v. Detroit Edison Co.,* 468 F.Supp. 702, 708 (S.D.N.Y.1979), aff'd, 618 F.2d 198 (2d Cir.1980); *Straus v. Holiday Inns, Inc.,* 460 F.Supp. 729, 736 (S.D.N.Y.1978).

■ The leading case in this circuit concerning the applicability of the materiality standard to prospective or contingent events is *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir.1968) (in banc), cert. denied sub nom. *Kline v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). That case involved both the corporation's liability under Section 10(b) and Rule 10b–5 with respect to a press release which it issued concerning a finding of mineral ores

---

show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983) (footnote omitted). *Accord: In re Lilco Securities Litigation,* 625 F.Supp. 1500, 1503 (E.D.N.Y. 1986); *Greenapple v. Detroit Edison Co.,* 468 F.Supp. 702, 708 (S.D.N.Y.1979), aff'd, 618 F.2d 198 (2d Cir.1980); *Feit v. Leasco Data Processing Equipment Corp.,* 332 F.Supp. 544, 575 (E.D.N.Y.1971). We read the district court's opinion, however, as essentially finding the alleged omissions immaterial as a matter of law absent definitive action at the board level. 631 F.Supp. at 1264–65.

9. *See TSC Indus. Inc., v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985).

10. *See* § 14(a) of the 1934 Act, 15 U.S.C. § 78n(a) (1982), and Rules 14a–3 and 14a–9, 17 C.F.R. §§ 240.14a–3 and .14a–9 (1987), promulgated thereunder.

11. The Court continued:

[T]he standard ... contemplate[s] ... a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. 426 U.S. at 449, 96 S.Ct. at 2132 (footnote omitted).

in eastern Canada, and the liability thereunder of corporate insiders who purchased the corporation's stock prior to full public disclosure of the finding. Addressing the second question, we said:

> [M]aterial facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities.

> In each case, then, whether facts are material within Rule 10b–5 when the facts relate to a particular event and are undisclosed by those persons who are knowledgeable thereof will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.

*Id.* at 849.

■ Because this standard was articulated in the insider trading context, a qualification must be expressed at the outset

concerning its application here. An insider may be liable for trading on the basis of, or "tipping" third parties concerning, information at a time when the corporation to which the information pertains is not yet under any duty to disclose it. *See, e.g., SEC v. Geon Indus., Inc.,* 531 F.2d 39, 48 (2d Cir.1976).

■ On the other hand, we do not address here a pure question of a duty to disclose. The Prospectus issued by TWA indisputably addressed itself to the ongoing relationship between TWA and TWC, and was obviously required to address that relationship. Accordingly, the issue we must consider is whether there were material omissions in that presentation. The general standard articulated in *Texas Gulf Sulphur* and quoted above, which has been cited and applied by this court [12] and other courts in varied contexts pertaining to disclosure requirements under the federal securities laws, is of clear importance to that evaluation.[13]

**12.** *See, e.g., Harkavy v. Apparel Indus., Inc.,* 571 F.2d 737, 741 (2d Cir.1978) (Section 10(b)/Rule 10b–5 case alleging material omission by a corporation and its chief executive officer in connection with the redemption of a shareholder's stock; passage quoted above from *Texas Gulf Sulphur* deemed to provide the applicable "rule concerning present facts which signal or influence the future patterns of a corporation"); *SEC v. Parklane Hoisery Co.,* 558 F.2d 1083, 1089 (2d Cir.1977) (*Texas Gulf Sulphur* balancing test applied to find material omissions in a proxy statement concerning negotiations for the sale of a leasehold interest); *SEC v. Geon Indus., Inc.,* 531 F.2d 39, 47–48 (2d Cir.1976) (insider found liable for tipping information respecting merger negotiations; despite argument that negotiations were in "embryonic" stage and therefore immaterial, *Texas Gulf Sulphur* "makes clear that not only the probability of an event but also the magnitude of its potential impact on a company's fortunes" are relevant to issue of materiality); *SEC v. Shapiro,* 494 F.2d 1301, 1305–06 (2d Cir.1974) (insider liable for trading in securities of company while in possession of non-public information respecting that company's prospects for merger; court applied balancing test of *Texas Gulf Sulphur*); *Chris–Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 368 (2d Cir.) (registration statement and prospectus issued in connection with exchange offer materially misleading for failure to disclose exchange offeror's negotiations for the sale of major

asset at considerably less than book value; materiality determined by applying test of *Texas Gulf Sulphur,* which is "to be applied where an event has not yet occurred but certain facts are known in advance"), *cert. denied,* 414 U.S. 910, 94 S.Ct. 232, 38 L.Ed.2d 148 *sub nom. SEC v. Bangor Punta,* 414 U.S. 924, 94 S.Ct. 234, 38 L.Ed.2d 158 (1973); *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 887 (2d Cir.1972) (defendants exonerated on charges that they traded on basis of inside information as to reasonably possible merger; materiality gauged by balancing test of *Texas Gulf Sulphur*).

**13.** We take note in this connection of the comment in TWC's brief, p. 28 n. 32, that *Texas Gulf Sulphur* and other cases cited by plaintiff "predate the Second Circuit's decision" in *Reiss v. Pan American World Airways, Inc.,* 711 F.2d 11 (2d Cir.1983). As indicated hereinafter, we deem *Reiss* to have stated a rule confined to the duty to disclose merger negotiations, and certainly not as impairing the authority of *Texas Gulf Sulphur,* which did not address that question and which in any event *Reiss* quoted and cited with approval. *Reiss,* 711 F.2d at 13. *See also Board of Educ. of City School Dist. of the City of New York v. Hufstedler,* 641 F.2d 68, 70 (2d Cir.1981) (Second Circuit panel bound by prior Second Circuit panel opinion unless prior opinion overruled in banc or by the Supreme Court).

## 2. *The Decision Below.*

The district court's ruling was based upon the fact that at the time TWA's prospectus was issued, a proposal to change the relationship between TWC and TWA had not yet been presented to TWC's board of directors, and TWC was not obligated "to disclose mere contingencies long in advance of the consideration of the question by those responsible for decision." 631 F.Supp. at 1265. The district court cited *Reiss v. Pan American Airways, Inc.,* 711 F.2d 11, 14 (2d Cir.1983); *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 951 (2d Cir.1969); and *Flum Partners v. Child World Inc.,* 557 F.Supp. 492, 499 (S.D.N.Y.1983), for the propositions that the "content of contingent speculations" and "the views held by individual directors" [14] need not be disclosed. 631 F.Supp. at 1264 and n. 17.

We do not regard these decisions as controlling here. *Reiss* is representative of a current trend in the courts to hold preliminary merger negotiations immaterial as a matter of law for purposes of Section 10(b)/Rule 10b–5 liability. These cases, and our view of their inapplicability to the facts of this case, are discussed hereinafter. The citation of *Electronic Specialty* refers to an alleged statement by a corporation's president, in response to a financial reporter's question, that the corporation's "preference" was to sell its holdings in a potential target at a time when he had personally decided that it would be advisable to reactivate a tender offer for the target, but had not yet presented that conclusion to his board of directors, for whose authority (in Judge Friendly's words) he "manifested punctilious regard." 409 F.2d at 951. *Electronic Specialty* would be per-

suasive authority were plaintiff's case here based *solely* upon Mr. Salizzoni's view of the TWA–TWC relationship as of June, 1983, but that is clearly not the case. *Flum Partners* states that "the failure to disclose future business plans is also not actionable." 557 F.Supp. at 499. To the extent that this statement is invoked as a general rule of law, rather than a disposition of the particular issues presented in that case, we deem it overbroad in view of *Texas Gulf Sulphur* and the cognate decisions cited hereinabove.

## 3. *The Preliminary Merger Discussion Cases.*

We turn next to *Reiss* and related cases that deal with the question of Section 10(b) Rule 10b–5 liability with respect to preliminary merger discussions. The district court considered this a "related context," and deemed *Reiss* highly persuasive, if not controlling, here. 631 F.Supp. at 1264–65.

A recent line of cases has rejected arguments that preliminary merger negotiations should be disclosed to the investing public. For example, in *Staffin v. Greenberg,* 672 F.2d 1196 (3d Cir.1982), the Third Circuit rejected claims that preliminary merger negotiations should have been disclosed to tender offerees and members of a broader class of open market sellers. It found preliminary merger discussions immaterial as a matter of law, finding merit in the opinions of other courts and commentators in the related area of takeover bids that disclosure of such discussions may do more harm than secrecy. *Id.* at 1206.[15] It held that a disclosure obligation arises once an agreement in principle is reached. *Id.* at 1207.

---

**14.** The reference here is to Frank L. Salizzoni, who during 1983 served as senior vice president-finance of TWC, was a member of the TWC and TWA boards of directors and executive committees and the TWA finance committee, was chairman of the TWC finance committee, and acted as the primary TWC liason with Goldman Sachs concerning its study of TWC's structure and finances. He testified on deposition that in June, 1983, he had come to the conclusion that "TWA and [TWC] both could be better

off if somehow we could separate the airline successfully in some manner."

**15.** The Court concluded:

Those persons who would buy stock on the basis of the occurrence of preliminary merger discussions preceding a merger which never occurs, are left "holding the bag" on a stock whose value was inflated purely by an inchoate hope. If the announcement is withheld until an agreement in principle on a merger is

In *Reiss v. Pan American World Airways, Inc.*, 711 F.2d 11 (2d Cir.1983), this court resolved a Section 10(b)/Rule 10b–5 action brought by holders of Pan Am convertible debentures who, pursuant to a call, sold their debentures rather than convert them into capital stock. Plaintiffs claimed that had they been aware that Pan Am was attempting to negotiate a merger with National Airlines, Inc., they would have converted their debentures. On appeal from a grant of summary judgment in Pan Am's favor, this Court affirmed, approving the rationale of *Staffin.* We noted that merger negotiations "are inherently fluid and the eventual outcome is shrouded in uncertainty. Disclosure may in fact be more misleading than secrecy so far as investment decisions are concerned.... [Merger negotiations involve] complex bargaining between two (and often more) parties which may fail as well as succeed, or may succeed on terms which vary greatly from those under consideration at the suggested time of disclosure." *Reiss*, 711 F.2d at 14.

Recently, in *Flamm v. Eberstadt*, 814 F.2d 1169 (7th Cir.1987), the Seventh Circuit followed *Staffin* and *Reiss* and held that a target company's search for a white knight was immaterial as a matter of law prior to agreement on the deal's price and structure.[16]

We do not question the wisdom of the rule of "constructive immateriality," as one commentator terms it, as it has been applied in the preliminary merger context. *See generally* Note, *Rule 10b–5 and the Duty to Disclose Merger Negotiations in Corporate Statements*, 96 Yale L.J. 547 (1987) [hereinafter "Note, *Duty to Disclose*"]. Indeed, the application of a different rule there could scuttle corporate deals, costing shareholders desirable merger premiums, either because acquiring corporations generally insist on negotiating mergers in confidence and may terminate a deal that is disclosed prematurely, or because early disclosure may drive the target corporation's stock price so high as to make merger consummation economically unfeasible. *See* Note, *Duty to Disclose* at 554–55; *see also Flamm*, 814 F.2d at 1176–78.

### 4. The Instant Case

Similar concerns are not implicated here. Section 11 of the 1933 Act "was designed

---

reached, the greatest good for the greatest number results. If the merger occurs, all of the company's shareholders usually benefit; if no merger agreement is reached, the stock performs as it would have in any event.
*Staffin*, 672 F.2d at 1207 (footnote omitted).

**16.** A related question which has produced a conflict among the circuits concerns whether a company, while negotiating a merger, may legally deny knowledge of new corporate developments. For example, in *Greenfield v. Heublein, Inc.*, 742 F.2d 751 (3d Cir.1984), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985), the Third Circuit held that a company engaged in preliminary merger discussions could deny knowledge of new corporate developments which might account for an unusual upsurge in public trading in its stock in response to a query from the New York Stock Exchange without running afoul of the federal securities laws. Arguably, *Greenfield*'s result is limited to its facts and does not supply a rule for all cases in this area. The Court found that although the insiders of Heublein, Inc. "clearly knew" what might have accounted for the increase in trading, since there was no indication that privi-

leged information respecting its preliminary merger discussions had leaked to the public or that insiders were trading in Heublein stock, the company's statement that it "was aware of no reason that would explain the activity in its stock ..." was not false or misleading. *Id.* at 758–59; *but see id.* at 763 (Higginbotham, J., dissenting). In *Levinson v. Basic Inc.*, 786 F.2d 741 (6th Cir.1986), *cert. granted*, — U.S. —, 107 S.Ct. 1284, 94 L.Ed.2d 142 (1987), the Sixth Circuit reversed a grant of summary judgment in favor of a company which denied the existence of merger discussions in response to requests for "no corporate development" statements from the New York Stock Exchange, when in fact such discussions were taking place. *See generally* Note, *Rule 10b–5 and the Duty to Disclose Merger Negotiations in Corporate Statements*, 96 Yale L.J. 547 (1987). In the Supreme Court of the United States, the United States filed an *amicus curiae* brief in support of the petition for certiorari recently granted in *Levinson* in which it advocated application of the balancing test of *Texas Gulf Sulphur. See* Brief for the United States as Amicus Curiae in Support of Petition for Writ of Certiorari at 8–9, 15, *Basic Inc. v. Levinson*, No. 86–279, *cert. granted*,

to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 686–87, 74 L.Ed.2d 548 (1983) (footnotes omitted). The defendants at bar were in control of the timing of the TWA issue and of the response to the Odyssey proposal to a far greater degree than were the corporate defendants in the preliminary merger cases of the events unfolding there as a result of negotiations with outside parties. Here, we see no reason to carve out the policy exception recognized by cases such as *Staffin, Reiss* and *Flamm* to the *Northway* and *Texas Gulf Sulphur* formulations of materiality.

*Texas Gulf Sulphur* recognizes that contingencies inextricably bound up with a company's fortunes need not be certainties to qualify as material. Were defendants' arguments to carry the day, corporate actors would be granted the power to render facts—objectively material facts under the standard of *Northway*—immaterial as a matter of law by steering them clear of the board room. The Third Circuit seems to have recognized as much, even in the merger context, noting in *Staffin* that circumstances may arise where failure to disclose merger negotiations short of agreement in principle may nonetheless be actionable where the "functional equivalent" of agreement obtains. *Staffin,* 672 F.2d at 1207. As an example, the *Staffin* Court cited *Thomas v. Duralite Co.,* 524 F.2d 577 (3d Cir.1975), a Section 10(b)/Rule 10b–5 case in which an insider was found liable on a record indicating that he deliberately postponed merger negotiations which had already yielded the "likelihood of acquisition" in order to purchase a large shareholder's stock at a favorable price. *Id.* at 585.

■ We conclude that the governing rule here is provided by *Northway* and *Texas*

*Gulf Sulphur,* rather than the *Staffin/Reiss/Flamm* line of authority. We further conclude that, judged by the strict standard applicable to the granting of motions for summary judgment, especially concerning questions of materiality, defendants' motion should not have been granted in this case.

As we have stated earlier, the TWA prospectus discussed in some detail the relationship between TWA and TWC, so the question presented is whether that discussion omitted to state material facts necessary to make the statements therein not misleading; not whether, considered in the abstract, there was an obligation to disclose those facts at that time.[17] Plaintiff contends, in essence, that there should have been some reference to the ongoing Goldman Sachs study of TWC's structure and finances, and to the possibility of a termination of TWA's status as a TWC subsidiary.

■ It is not our role at this juncture, of course, to decide whether plaintiff is correct. Rather, we are to determine whether plaintiff raised a genuine issue of material fact concerning the matter. Fed.R.Civ.P. 56(c). In making this determination, we take into account the *Texas Gulf Sulphur* test calling for a balancing of the likelihood of an event's occurrence with its anticipated magnitude if it occurs "in light of the totality of the company activity," *Texas Gulf Sulphur,* 401 F.2d at 849, and decline to rule that no disclosure could be material, as a matter of law, until any proposal for the termination of TWA's status as a TWC subsidiary was presented to TWC's board of directors.

As to the magnitude of the event, we agree with the district court that:

It is not disputed that the nature of the relationship between TWC and TWA, in which TWC guaranteed much of the

---

— U.S. —, 107 S.Ct. 1284, 94 L.Ed.2d 142 (1987).

**17.** Substantially the same standard is stated in Section 11 of the 1933 Act and Rule 10b–5.

credit upon which TWA did business and financed its substantial requirements for operating capital, was critical to the decisions faced by knowledgeable investors in evaluating TWA's value as an investment, particularly in view of the fact that TWA had suffered substantial losses in the period before July 29, 1983.

631 F.Supp. at 1263. Furthermore, when TWC announced on September 28, 1983 that it was "considering the possible separation of TWA," the price of TWA's common stock went into an immediate and sharp decline.

The likelihood of the event's occurrence cuts much less sharply in favor of plaintiff, but there was certainly, at a minimum, a substantial possibility of its occurrence. Especially given the fact that the TWC–TWA relationship was given considerable attention in the TWA prospectus, we cannot say, in ruling on a motion for summary judgment, that the evidence is "so one-sided that one party must prevail as a matter of law" and does not "present[ ] a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, —, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

For example, the discussion in the TWA prospectus of various arrangements and relationships between TWA and TWC stated that there might in the future be "other arrangements . . . [to] be determined on an arms-length basis," adding that "[t]here can be no assurance, however, that these terms will be favorable to TWA or that [TWC] will continue to provide TWA with the same level of support for TWA's financing and other needs as it has in the past." A jury might conclude that this language, while anticipating revisions of the multitude of relationships existing between TWA and TWC, did not give any fair indication of the equally substantial possibility that TWA's status as a TWC subsidiary might be terminated. Indeed, the suggestions of diminished future support of TWA by TWC, and of possible future sales of some TWA stock, could both be read to imply that some continuing relationship between TWC and TWA, although one less favorable to the latter, was contemplated.

There was no mention in the TWA prospectus of the ongoing Goldman Sachs study. The district court noted that Goldman Sachs' activities in investigating alternative structures for TWC "had been extensively publicized by TWC in connection with the proxy solicitation by Odyssey Partners." 631 F.Supp. at 1265. All of TWC's activity in that regard pre-dated the annual meeting of TWC which occurred on April 27, 1983, however, and on June 23, 1983, TWC issued a press release in which its chairman stated that "[TWC] now has set targets that by 1987 its presently unprofitable airline subsidiary, TWC, should become a source of $100 million in pre-tax profits . . ." There are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a proxy statement or prospectus on the basis that the information is public knowledge and otherwise available to them. *See Spielman v. General Host Corp.*, 538 F.2d 39, 40–41 (2d Cir.1976) (per curiam); *Fisher v. Plessey Co. Ltd.*, 559 F.Supp. 442, 445–48 (S.D.N.Y.1983). At a minimum, in any event, an issue is presented whether purchasers of TWA's cumulative convertible preferred stock could properly be charged with knowledge on July 29, 1983 and thereafter that Goldman Sachs was then engaged in a study on behalf of TWC one of the live options of which was a termination of TWA's status as a TWC subsidiary. That it was then live is evidenced by Ms. Casati's notes taken at the July 7 meeting of Goldman Sachs representatives with TWC officials, despite her inability upon deposition to recollect what was said or meant.

Plaintiff also points out that, although defendants contend that it would have been inappropriate to discuss in the July pro-

spectus any of the options under consideration by Goldman Sachs prior to their consideration by the TWC board of directors, one of those options, additional sales of TWA stock, was in fact so discussed. The prospectus stated that consents had been obtained from TWC's lenders to allow creation of up to a forty percent public holding of TWA's common stock, and that TWA and TWC might make future sales which would increase the public holding beyond forty percent, assuming any required consents of lenders and stockholders were obtained.[18] Additional sales of TWA stock was one of the options under consideration by Goldman Sachs.

There is other evidence of record that bears upon the ultimate issue of a material omission. For example, although the Odyssey proposal called for a "disaggregation" of TWC's five subsidiaries, there is evidence indicating that Odyssey privately informed Mr. Salizzoni that it would be satisfied if only TWA were separated from the holding company. The record also indicates that some significant shareholders supported the Odyssey proposal, but felt it best to let management work things out without the pressure of a shareholder resolution. Alliance Capital Management Corporation, for example voted over 750,000 shares owned by its pension and endowment fund clients against the Odyssey proposal, but contemporaneously indicated in a letter dated April 27, 1983 to L. Edwin Smart, TWC's chairman, that it saw "much merit to the Odyssey plan." [19] Nor would a jury be required to accept at face value the testimony of defendants' witnesses that the Goldman Sachs study was not presented to TWC's board of directors in July, 1983, as originally planned and prior to the TWA public offering, solely because the

study was not then ready to be presented. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–58, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970).

The foregoing does not constitute an exhaustive recital of the evidentiary points plaintiff might make at trial, and of course, given the issue presented to us, does not touch upon the ripostes available to defendants. Enough has been said, however, to make it clear that, under the standards provided by *Northway* and *Texas Gulf Sulphur*, plaintiff tendered genuine issues of material fact as to whether there were material omissions in TWA's July 29, 1983 prospectus. Accordingly, summary judgment should not have been rendered in favor of defendants.

## CONCLUSION

In the interests of caution, we wish to stress that our discussion of certain factual issues and evidence herein, for the limited purpose of demonstrating the existence of genuine issues of material fact precluding summary judgment, intimates no view whatever concerning the merits and ultimate outcome of this litigation. The judgment of the district court is reversed and the case remanded for further proceedings not inconsistent with this opinion.

MINER, Circuit Judge, dissenting:

Since I cannot agree that there is any triable issue of fact as to whether TWA's July 29, 1983 prospectus contained any untrue material fact or omitted to state any material fact, I respectfully dissent.

---

**18.** We recognize the pertinence in the July prospectus of a possible occurrence which could dilute the common stock into which the preferred stock offered by that prospectus was convertible.

**19.** The letter continued, in pertinent part, as follows:

Further, we thought the Odyssey proposal put management under too much pressure for fast action on divesting or selling assets. Finally, we saw no virtue at all to the Corpora-

tion selling assets; we would only favor partial or total spinoff of subsidiaries to stockholders.

\* \* \* \* \* \*

The minority divestiture of Trans World Airlines, Inc. is a step in the right direction, and we are shareholders. We hope this is a first move towards spinning off to shareholders more of TWA and other subsidiaries which have "stand alone" capability.

Although the spin-off of TWA always was a *possibility*, it was only one of a number of options available to TWC management for dealing with its problems in regard to TWA at the time the prospectus was issued. It seems clear that no decision of any kind was made until Goldman Sachs placed *seven* alternative choices before the TWC Board of Directors on September 6, 1983. The Goldman Sachs report was referred to the Board's Finance Committee for consideration, and, on September 27, 1983, the Committee recommended one of the seven options—development of a program to separate TWA from TWC. The directors did not adopt a formal plan of separation until October 23, 1983, almost three months after the issuance of the prospectus upon which plaintiff predicates his claim.

The prospectus gave specific notice to prospective shareholders of TWA that TWC might not provide the same financial support to TWA as it had provided in the past. The shaky financial condition of TWA was apparent from the financial information furnished to those interested in purchasing shares at the public offering, and the prospectus gave further notice that TWC might "sell or otherwise dispose of" its shares of TWA. The information provided was full and complete, potential investors were cautioned adequately as to the problems facing the company, and there was no false representation of any kind. A jury should not be afforded the opportunity to speculate otherwise.

I cannot agree that the statement in the prospectus giving notice of the possibility of withdrawal of financial support by TWC "did not give any fair indication that TWA's status as a TWC subsidiary might be terminated." The withdrawal of financial support could be seen to lead to a total collapse of TWA, let alone termination of its status as a subsidiary. Moreover, another provision in the prospectus warning that TWC might sell its shares clearly indicated the possibility of spin-off. The risky nature of an investment in TWA should have been apparent to all those who took the time to examine the prospectus. Nor do I agree that there is an issue whether stock purchasers can be charged with knowledge that Goldman Sachs was undertaking a study involving the "live" option of separation. It seems to me that there was no need to notify prospective purchasers of the study at all, because the study was in progress and had produced no options, "live" or otherwise, at the time of the public offering.

The mere fact that the Odyssey proxy battle centered on a proposal for "disaggregation" of TWC's subsidiaries does not create a triable issue as to whether divestiture of TWA should have been included in the prospectus. The Odyssey proposal was defeated, partially on the strength of the pending Goldman Sachs review of all available "structural and financial" alternatives. Although Mr. Salizzoni, a senior vice-president and director of TWC, had concluded in June 1983 that separation was desirable, there is no indication that his opinion was imparted to any other board member or that any other board member held the same view. In point of fact, Odyssey's defeat in the proxy contest represented a corporate rejection of the separation proposal. With regard to the Casati notes, I fail to see how the idle scribblings of a minor functionary of Goldman Sachs during a meeting with TWC representatives could possibly be indicative of material facts required to be revealed in a prospectus.

Resolution of the question of materiality requires an assessment of the "probability that the event will occur." *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.1968) (in banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). There simply is no way in which the evi-

dence can be viewed so as to permit a finding that spin-off was any more probable at the time the prospectus was issued than any of the six other options eventually considered. That being so, and there being no *genuine* factual issue of any kind remaining in the case, summary judgment must be granted to the defendants. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, ——, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 213 (1986). Where summary judgment is appropriate, it should be granted without hesitation. *See Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). *See generally* New York State Bar Assoc. Comm. on Fed. Courts, Summary Judgment in the Second Circuit (Mar. 23, 1987) (unpublished manuscript). I respectfully suggest that it is appropriate here.