**Naomi KLEIN, on Behalf of the Naomi Klein IRA and All Others Similarly Situated, Plaintiffs,**

v.

**PDG REMEDIATION, INC., et al. Defendants.**

**No. 95 Civ. 4954 (DAB).**

United States District Court, S.D. New York.

Sept. 17, 1996.

Lowey Dannenberg Bemporad & Selinger, P.C., New York City (Richard Bemporad, David C. Harrison, Thomas M. Skelton, of counsel), for Plaintiffs.

Kelley Drye & Warren, New York City (Alan R. Kusinitz, Roderick J. Cassidy, of counsel), for Defendants.

### MEMORANDUM AND ORDER

BATTS, District Judge.

Plaintiff, on behalf of a class,[1] brings this action for recovery pursuant to Sections 11, 12(2) and 15 of the Securities Act of 1933. Defendants[2] now move to dismiss the sections 11 and 12(2) claims pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

### I. BACKGROUND

Plaintiff brings her claim as a class action on behalf of all persons and entities who purchased the common stock of PDG Remediation, Inc. ("PDG") from February 9, 1995, when PDG's initial public offering ("Public Offering") of 1,000,000 shares of common stock at $5.00 per share became effective, through and including May 23, 1995. (Compl. ¶ 1.) The Defendants include PDG, its officers and directors, and several broker-dealers who bought stock from PDG and then sold it to the investing public. (Id. ¶¶ 13–32.)

PDG's Registration Statement and Prospectus represented that most of PDG's revenues were derived from a Florida State-funded reimbursement program, which program was established to finance the upgrade and clean-up of sites contaminated by petroleum leakage in underground storage tanks ("UST"). (Id. ¶ 2.) PDG represented in the Prospectus that it was not aware of any planned discontinuation or alteration of this Florida reimbursement program which would adversely impact PDG's financial condition.

(Id. ¶ 3.) In fact, revenues were predicted to be between seven and nine million for that fiscal year and up to fifty million within the next four years. (Id.)

Plaintiff alleges that the Defendants failed to disclose that the Florida reimbursement program had operated at a deficit of $60,000,-000 for the past two years, and hence, was being revised to eliminate funding for lower priority sites, which accounted for a major portion of PDG's business. (Id. ¶ 4.) Furthermore, the Defendants failed to disclose that three different Florida agencies—a statewide grand jury, the Florida Department of Environmental Protection, and the Florida House Committee on Natural Resources—had conducted separate investigations relating to the program and released reports calling for modifications of the program and a moratorium on any payments. (Id. ¶ 5.)

On March 8, 1995, the Governor of Florida issued an executive order suspending any reimbursement payments. (Id. ¶ 6.) On March 17, 1995, the Florida Legislature enacted legislation reestablishing the priority system based on the level of site contamination. (Id.) The effect of these actions eliminated reimbursement for approximately 50% of the low priority sites on which PDG had rendered remediation. (Id. ¶ 7.) PDG then suffered losses. On May 23, 1995, the stock price closed at $1⅞. (Id. ¶ 8.)

The prospectus laid out several areas that were considered risk factors, beginning with the following paragraph:

> The Securities offered hereby are speculative in nature and involve a high degree of risk. The securities should be purchased only by persons who can afford to lose their entire investment. Attention should be paid to the following risk factors in evaluating the company and the offering

---

1. Although, the action is labeled a class action there has been no motion for certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. Accordingly, the Court will refer to "Plaintiff" rather than "Plaintiffs."

2. The "Underwriter Defendants" or Coleman and Company Securities, Inc., First Colonial Securities Group, Inc., Rickel & Associates, Inc., Southeast Research Partners Inc., Laidlow Equi-

ties Inc., Foster Jeffries & Co., Inc., Frederick & Co., Inc., Gaines, Berland Inc., Smith, Moore & Co. and Starr Securities Inc. originally moved for dismissal. Pursuant to a February 22, 1996 Order, the rest of the Defendants were granted permission to join in the Underwriter Defendants' motion. Hence, this Order applies to all the Defendants.

before purchasing any security offered hereby.

The areas of risk were labelled as follows: a limited operating history, potential environmental liability, dependence on continued environmental regulation, time lag on accounts receivable, intense competition, need for additional financing, potential inadequacy of insurance, reliance on management, conflicts of interest, voting control, and dividend restrictions. One further section, particularly applicable here, reads as follows:

> Currently a majority of the [PDG]'s business is directly or indirectly related to the Florida UST remediation reimbursement program. Under this program [PDG] is paid for environmental services rendered by the state fund created for that purpose from excise taxes on fuels.... Although [PDG] is not aware of any planned discontinuance or alteration of the Florida UST remediation reimbursement program to exclude payment to service providers such as [PDG], any such discontinuance or alteration could result in a material adverse change in its business, operating results and financial condition.[3]

## II. DISCUSSION

"On a motion to dismiss under Rule 12(b)(6), [as with a 12(c) motion,] the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of N.Y.,* 53 F.3d 465, 469 (1995) (citations omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994) (citing *Ad–Hoc Comm. of Baruch Black and Hispanic Alumni Ass'n v. Bernard M. Baruch College,* 835 F.2d 980, 982 (2d Cir.1987) for the proposition that courts are to apply the same standards used in a 12(b)(6) motion to a 12(c) motion). "The district court should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Walker v. City*

*of N.Y.,* 974 F.2d 293, 298 (2d Cir.1992) (quoting *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119 (2d Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957))), *cert. denied,* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993).

Liability arises under Sections 11 and 12(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77l(2), where registration statements and prospectuses contain materially false or misleading statements, or omit material statements. Section 77k states in part,

> (a) In case any part of the *registration statement,* when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proven that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue
>
>> (1) every person who signed the registration statement;
>>
>> (2) every person who was a director of ... or partner in the issuer ...
>>
>> (5) every underwriter with respect to such security. (emphasis added.)

In *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 686–87, 74 L.Ed.2d 548 (1983) the United States Supreme Court states,

> Section 11 of the 1933 Act was designed to assure compliance with the disclosure provisions of the Act by imposing stringent standards of liability on the parties who play a direct role in a registered offering.... [A plaintiff] *need only show a material misstatement or omission to establish his prima facie case.* Liability against the issuer of a security is virtually absolute, even for innocent misstatements.... Although limited in scope,

---

**3.** The Court has not been provided with a copy of the Registration Statement. However, the Plaintiff alleges that the Registration Statement contains the same misleading statements as the Pro-

spectus. The Court, viewing the facts in a light most favorable to the Plaintiff, for the purposes of this motion, will accept that fact as true.

§ 11 places a relatively minimal burden on a plaintiff. . . .

The Second Circuit ruled that a violation of Section 11 will be found when "material facts have been omitted or presented in a way as to obscure or distort their significance." *I. Meyer Pincus & Assocs., P.C., v. Oppenheimer & Co.,* 936 F.2d 759, 761 (2d Cir.1991) (citations omitted).

Section 771 states in part,

Any person who— . . .

(2) offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a *prospectus* or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading . . . and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him. . . . (emphasis added.)

Similar to Section 11, to state a claim pursuant to Section 12(2) Plaintiff must demonstrate that the Prospectus rather than the Registration Statement omitted a material fact. The definitions of materiality apply to each.

■ A statement or omission is material if there is a "substantial likelihood that a reasonable shareholder would consider it important in deciding" which stock to purchase, *Kronfeld v. Trans World Airlines, Inc.,* 832 F.2d 726, 731 (2d Cir.1987) (quoting *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988), or there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 731 n. 11 (quoting *TSC Indus.,* 426

U.S. at 449, 96 S.Ct. at 2132). Material facts include not only information disclosing the earnings and distributions of a company but also "facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *Id.* at 732 (quoting *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)).

Whether a statement is material is usually a question for the fact finder. *TSC Indus.,* 426 U.S. at 450, 96 S.Ct. at 2133; *Mendell v. Greenberg,* 927 F.2d 667, 673 (2d Cir.), *modified on other grounds,* 938 F.2d 1528 (2d Cir.1990); *Kronfeld,* 832 F.2d at 734–36. Accordingly, it is unlikely, as a matter of law, that a cause of action can be dismissed which requires a determination of materiality. The issue for the Court is whether the Plaintiff has stated a claim that the statements Defendants allegedly did not disclose, taken together and in context, would have mislead a reasonable investor, or were material.[4] *I. Meyer Pincus,* 936 F.2d at 761; *Krouner v. American Heritage Fund, Inc.,* 899 F.Supp. 142, 147 (S.D.N.Y.1995). On the record before it, the Court can certainly see how a fact finder could determine that the reimbursement program was a large source of PDG's income and therefore the existence of governmental reports that the reimbursement may be modified in any way is extremely important to the average, or other type of, investor's decision to purchase the PDG stock; and, accordingly, the information was material.

■ The Defendants argue that the information was public, or already in the "total mix," and accordingly it was immaterial. *Fisher v. Plessey Co.,* 559 F.Supp. 442, 446 (S.D.N.Y.1983). Although the documents had been published, they were not widely available. The Court cannot find as a matter of law that, to an investor in New York or Colorado, the workings of a Florida grand jury or a Florida state legislative committee is easily accessible and is part of the "total

4. Defendants argue that the Court must make a preliminary determination that the Defendants had a duty to disclose the omitted statements. However, the case law the Defendants cite applies to Rule 10b–5 cases and none of the case law dealing with Sections 11 or 12 indicate that a duty is necessary to establish a violation of them.

mix." Furthermore, the inquiry into whether information is part of the "total mix" does not end with the revelation that the information was public, rather the inquiry must turn to whether the investors could have reasonably been aware of the information. *United Paperworkers Int'l Union v. International Paper Co.*, 985 F.2d 1190, 1198–99 (2d Cir. 1993); *Kronfeld*, 832 F.2d at 736; *Fisher*, 559 F.Supp. at 446. It is unreasonable to assume nationwide investors or even Florida investors would be aware of Florida legislative or grand jury reports. Accordingly, the Court finds this information was not part of the "total mix."

In addition, the attempt by the Defendants to shift the burden of gaining this knowledge to the investors is not consistent with the purpose behind the rules. *Feit v. Leasco Data Processing Equip. Corp.*, 332 F.Supp. 544, 563 (E.D.N.Y.1971). The main purpose of the 1933 Act is disclosure, with the ultimate goal of investor protection. *Id.* at 563–63. The Act was passed in order to ensure that investors had enough information to enable them to arrive at their own rational decisions. *Id.* at 563. Section 11 was passed to impose a stringent standard of liability on those who play a direct role in a public offering. *Kronfeld*, 832 F.2d at 734–35. Investors rely on underwriters to supply the appropriate information. *Id.; Spielman v. General Host Corp.*, 538 F.2d 39, 40–41 (2d Cir.1976). When the underwriter has not provided information the investor reasonably assumes that the information does not exist. *Feit*, 332 F.Supp. at 563. Hence, the burden is not on the Plaintiffs to investigate, but on the Defendants to disclose.

The Defendants also argue that if they were required to provide information regarding the legislative and grand jury reports, they would be predicting future events which is not required of them. However, this argument is meritless because the legislative and prosecutorial bodies had already made their decisions. The Plaintiff does not claim that PDG had to predict what the legislative would do, rather, she claims that PDG simply had to tell the investors of the existence of the reports; the investors could then make an informed decision regarding whether to buy the stock. *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d at 849–50. In the same vein, Defendants argue that the statements regarding potential legislative changes were neutralized by bespeaks caution language and hence, were not material. However, the "bespeaks caution" doctrine only applies to forward looking information. *Kronfeld*, 832 F.2d at 736. The information omitted was not forward-looking but facts that already existed.

## III. CONCLUSION

The Court finds that reading the Complaint in the light most favorable to the Plaintiff, it is not beyond doubt that the Plaintiff can prove no set of facts in support of her claim which would entitle her to relief. Hence, the Defendants' motion to dismiss, pursuant to Rule 12(c), is DENIED.

SO ORDERED.