Harold J. ROBBINS and Alan Freberg, Plaintiffs,

v.

MOORE MEDICAL CORP., et al., Defendants.

No. 91 Civ. 3701 (SAS).

United States District Court, S.D. New York.

Aug. 1, 1995.

Lester L. Levy, Wallace A. Showman, Wolf Popper Ross Wolf & Jones, Robert I. Harwood, Andrew Davidovitz, Wechsler Skirnick Harwood Halebian & Feffer, New York City, for plaintiffs Harold J. Robbins and Alan Freberg.

Robert W. Forman, Greenberger & Forman, New York City, for defendant Moore Medical Corp.

Dennis J. Block, Weil, Gotshal & Manges, New York City, for defendants Mark E. Karp, Steven Kotler, Jerald K. Rome, Bruce Slovin, Robert H. Steele, Richard M. Tasso, Wilmer J. Thomas, Jr. and Peter C. Sutro.

*OPINION AND ORDER*

SCHEINDLIN, District Judge.

Plaintiffs Harold J. Robbins ("Robbins") and Alan Freberg ("Freberg") sue Defendants Moore Medical Corporation, Mark E. Karp, Steven Kotler, Jerald K. Rome, Bruce Slovin, Robert H. Steele, Richard M. Tasso, Wilmer J. Thomas, Jr., Alan L. Feir, John A. Murray and Peter C. Sutro ("Moore" or "Defendants") under § 10(b) and § 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. Defendants now move for summary judgment pursuant to Fed.R.Civ.P. 56(c). For the reasons stated below, Defendants' motion is granted.

I. *BACKGROUND*

On July 27, 1989, Freberg purchased 100 shares of common stock in Moore Medical, a national wholesale distributor of brand name and generic pharmaceuticals as well as medical and surgical supplies. *See* Deposition of Freberg, July 17, 1992 ("Freberg Dep."), at 25, annexed as Ex. 59 to Affidavit of Dennis J. Block, Attorney for the Individual Defendants, January 27, 1995 ("Block Aff."). Robbins purchased 100 shares of Moore Medical on August 1, 1989. *See* Deposition of Robbins, July 22, 1992 ("Robbins Dep."), at 11, annexed as Ex. 66 to Block Aff. In 1987, Defendants decided to augment their drug distribution business by acquiring a small manufacturer of generic drugs, West-ward, Inc. *See* Deposition of Rome, March 23, 1994 ("Rome Dep."), at 44, annexed as Ex. 67 to Block Aff. Plaintiffs represent a class of shareholders who purchased Moore stock from May 10, 1988, the date Moore announced its financial results for the first quarter of fiscal 1988, through March 6, 1991, when Moore announced:

> The Company [Moore] is actively pursuing the sale of its West-ward generic drug manufacturing subsidiary … [T]his subsidiary has been treated as a discontinued operation and its losses from operations and the expected loss of $6.6 million on selling the business have been reported separately …

Press Release dated March 6, 1991, annexed as Ex. 33 to Block Aff. Plaintiffs claim that this announcement culminated a lengthy period during which Defendants recklessly misstated or omitted information concerning West-ward that was or would have been material to a reasonable investor in Moore. *See* Plaintiffs' Memorandum of Law In Opposition to Defendants' Motion for Summary Judgment at 4 ("Pl.Mem.").

Although Plaintiffs sued separately, their actions have been consolidated. *See Robbins v. Moore Medical*, 788 F.Supp. 179, 181–82, n. 1 (S.D.N.Y.1992). In denying Defendants' motion to dismiss the complaints, Judge Lasker summarized Plaintiffs' claims:

> Plaintiffs allege two types of mutually reinforcing deceit by defendants … [F]irst, that Moore Medical fraudulently made public announcements and filed documents with the Securities and Exchange Commission (SEC) identifying factors, unrelated to West-ward, as the significant impediments to Moore Medical's profitability when in fact West-ward seriously diminished its current and future liability, or else downplaying the severity of problems at West-ward, thereby creating the false perception among investors that correction of the disclosed factors would lead to improved performance by Moore Medical overall. Second, plaintiffs allege that statements of optimism concerning West-ward's and Moore Medical's future results, which were

contained in various Moore Medical announcements and SEC documents and typically accompanied any limited acknowledgments of West-ward's shortcomings which were made, were inconsistent with the Company's knowledge that West-ward's poor results would continue and would significantly lessen Moore Medical's earnings. Among West-ward's alleged undisclosed problems were ongoing inventory problems, underutilization of productive capacity, and regulatory difficulties with the Food and Drug Administration (FDA). It is alleged that the goal and result of this scheme was an inflated price for Moore Medical stock.

*Id.* at 182.

Plaintiffs allege a pattern of fraud consisting of many material omissions and misstatements, which the Court groups by year:

### A. *Before and During 1988*

1. Laudatory statements by Defendants about West-ward: In a series of press releases concerning Moore's acquisition of West-ward, Defendants stated that "West-ward has established a fine reputation for quality products," Press Release dated July 15, 1987, annexed as Ex. 1 to Block Aff., and that West-ward "is highly regarded in the industry for its quality line of products," Press Release dated December 23, 1987, annexed as Ex. 3 to *id.* These statements were repeated in a press release announcing the completion of Moore's acquisition of West-ward. *See* Press Release dated January 27, 1988, annexed as Ex. 4 to *id.*

2. Non-disclosure of Moore's lack of experience in managing a manufacturing operation. *See* Pl.Mem. at 43.

3. Non-disclosure of Moore's capital investment in its West-ward subsidiary. *See id.* at 44.

4. Non-disclosure of West-ward's losses, separate from Moore's. *See id.* at 47.

5. Non-disclosure of West-ward's troubles gaining FDA approval of the "recipes" of the drugs West-ward sought to manufacture, and the deleterious effect of this trouble on Moore's financial condition. *See id.* at 45.

### B. *In 1989*

1. Encouraging statements: that Defendants—

(i) "look[ed] forward to [Moore's] returning to much improved levels of growth and profitability," Press Release dated March 21, 1989, annexed as Ex. 15 to Block Aff.,

(ii) were "very optimistic about [Moore's] sales and operations for all of 1989," Press Release dated May 3, 1989, annexed as Ex. 17 to *id.*,

(iii) "anticipate[d] continued sales growth in all areas of the business, especially at West-ward," Press Release dated November 1, 1989, annexed as Ex. 22 to *id.*, and

(iv) were "optimistic that it [West-ward] will become profitable during the year." 1989 Annual Report at 4, annexed as Ex. 26 to *id.*

2. Non-disclosure of Moore's continued capital investment in West-ward. *See* Pl. Mem. at 49.

3. No separate disclosure of West-ward's losses in Moore's 1989 Forms 10–Q. *See* Pl.Mem. at 50–51.

### C. *In 1990*

1. FDA troubles: Defendants' statement that "[t]he Company [Moore] believes that it complies in all material respects with the applicable statutes and regulations," including FDA regulations, 1989 Form 10–K at 5, annexed as Ex. 25 to Block Aff, in light of an FDA inspection of West-ward. *See* Pl.Mem. at 54. Also, later statement that "we believe the major generic drug recalls and product withdrawals of certain generic drug manufacturers are substantially over." Press Release dated August 7, 1990, annexed as Ex. 29 to Block Aff.

2. No timely disclosure of Defendants' efforts to sell West-ward. *See id.* at 52.

3. Continued announcements of West-ward's sales growth ("We are encouraged by the improved business of our West-ward manufacturing operation where sales for the quarter were about 75 percent above the quarter for a year ago," Press Release dated

May 3, 1990, annexed as Ex. 27 to *id.*), without a separate disclosure of West-ward's losses.

Plaintiffs claim that Defendants had a duty to disclose the information described above, and that reasonable investors would have considered the alleged misstatements and omissions materially misleading both individually and as a group. *See* Pl.Mem. at 36. Because the Court disagrees with both of Plaintiffs' contentions, it grants Defendants' motion for summary judgment.

## II. *DISCUSSION*

### A. *The Standard for Summary Judgment*

This Court can only grant summary judgment when there exists no genuine issue of material fact for a jury to consider. Fed. R.Civ.P. 56; *see, e.g., Mayer v. Oil Field Systems Corporation,* 803 F.2d 749, 756 (2d Cir.1986). When considering a motion for summary judgment, it is the court's responsibility "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Nonetheless, summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

 As the Supreme Court explained in *Celotex:*

A party seeking summary judgment always bears the initial responsibility of in-

forming the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. at 2553 (internal citations omitted). The Court added that "the burden on the moving party may be discharged by showing ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554 (internal citations omitted). The burden then shifts to the non-moving party to demonstrate the existence of a genuine issue of material fact. *See id.* at 322–23, 106 S.Ct. at 2552–53. The non-moving party may not rely solely on its pleadings or on conclusory factual allegations in meeting this burden. *See Heil v. Lebow,* [Current Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,465, at 91,186, 1994 WL 637686 (S.D.N.Y. Nov. 14, 1994); *see also Gray v. Darien,* 927 F.2d 69, 74 (2d Cir.1991), *cert. denied,* 502 U.S. 856, 112 S.Ct. 170, 116 L.Ed.2d 133 (1992). The non-moving party instead must offer specific evidence supporting its claim that there exists a genuine issue of material fact. *See Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *see also Heil* at 91,186. In demonstrating that the issue in dispute is "genuine", the non-moving party must offer evidence sufficient to allow a reasonable jury to return a verdict in its favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see also Heil* at 91,186.

### 2. *The Applicable Standards under the Securities Exchange Act of 1934*

#### 1. *§ 10(b):* [1]

The Securities Exchange Act of 1934 was designed to protect investors against the ma-

---

**1.** § 10(b) provides, in relevant part, that it shall be unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission [SEC] may prescribe ..." 15 U.S.C. § 78j(b).

Rule 10b–5 provides that it shall be unlawful:

"(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a

nipulation of stock prices. *See Basic Inc. v. Levinson,* 485 U.S. 224, 230, 108 S.Ct. 978, 982–83, 99 L.Ed.2d 194 (1988). Underlying the Act is a philosophy that honest markets require honest publicity so that investors can make informed choices. *See id.* To prove a claim under § 10(b), plaintiffs must demonstrate they were influenced by "(1) material misstatements or omissions, (2) indicating an intent to deceive or defraud, (3) in connection with the purchase or sale of a security." *Brown v. E.F. Hutton Group,* 991 F.2d 1020, 1031 (2d Cir.1993).

▮ For an omission to be actionable under § 10(b), (1) there must have been a duty to disclose the omitted fact, and (2) the omitted information must have been material. *See Levine v. NL Industries, Inc.,* 926 F.2d 199, 202 (2d Cir.1991). Information need only be revealed if disclosure is required by statute or regulation, or if it is necessary to prevent a different statement from being materially misleading. *See Glazer v. Formica Corporation,* 964 F.2d 149, 156 (2d Cir.1992). "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic Inc. v. Levinson,* 485 U.S. at 239, n. 17, 108 S.Ct. at 987, n. 17.

▮ A statement that is materially misleading is actionable under Rule 10b–5. "Whether a particular statement or omission is materially misleading is a 'mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts.' " *In re Northern Telecom Ltd. Sec. Litig.,* [Current Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 98,390 at 90,660, 1994 WL 455534 (S.D.N.Y. Aug. 22, 1994) (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2132–33, 48 L.Ed.2d 757 (1976)). The Supreme Court has established the standard of materiality:

An omitted fact [or a misleading statement] is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding [whether to buy or sell shares] ... [T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Industries,* 426 U.S. at 449, 96 S.Ct. at 2132.[2] "[T]o prevail on a Rule 10b–5 claim, a plaintiff must show that the statements were *misleading* as to a *material* fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." *Basic,* 485 U.S. at 238, 108 S.Ct. at 986–87 (emphasis in original).

The determination [of whether a nondisclosed fact is material] requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these inferences are peculiarly ones for the trier of fact. Only if the established omissions [or misstatements] are "so obviously important [or unimportant] to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment.

*TSC Industries,* 426 U.S. at 450, 96 S.Ct. at 2133 (quoting *Johns Hopkins University v. Hutton,* 422 F.2d 1124, 1129 (4th Cir.1970)).

#### 2. § 20(a)[3]

▮ "To establish a claim under § 20, a plaintiff must establish (1) a primary violation, (2) scienter, and (3) control of the primary violator by the defendant." *Robbins,* 788 F.Supp. at 188; *see also Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir.1973).

fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

**2.** *TSC* involved a claim under § 14(a) of the Securities Exchange Act; the Supreme Court explicitly extended the *TSC* standard of materiality to § 10(b) cases in *Basic Inc. v. Levinson,* 485 U.S. at 232, 108 S.Ct. at 983–84.

**3.** § 20(a) provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be jointly and severally liable with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action. 15 U.S.C. § 78t(a).

Plaintiffs thus must survive summary judgment as to their § 10(b) claim to proceed under § 20(a).

### C. *Applying the Appropriate Standards to the Instant Case*

■ Plaintiffs claim that "all of defendants' public statements complained of by plaintiffs were individually materially false as well as when taken together as painting [*sic* ] a completely misleading picture of West-ward." Pl.Mem. at 36. Plaintiffs quite correctly note that " '[t]he central issue ... is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor.' " *Id.* at 35 (quoting *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 900 F.2d 576, 579 (2d Cir.1990), *cert. denied,* 501 U.S. 1249, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991)).

When considered as a whole, the individual misstatements and omissions alleged to be materially misleading do not present a triable issue of fact, because Plaintiffs have failed to present any specific evidence that Defendants acted with scienter, defined as "an intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976).[4] The failure to offer any evidence of scienter is proper grounds for granting summary judgment. *See Mayer v. Oil Field Systems Corporation,* 803 F.2d at 756 (noting that in a securities fraud case "summary judgment is appropriate when the nonmoving party has come forward with no evidence from which a reasonable factfinder could find that the defendant had the requisite state of mind.") In the instant case, Plaintiffs have established neither "a motive to commit fraud and an opportunity to do so" nor "circumstantial evidence of either reckless or conscious misbehavior." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53 (2d

Cir.1995) (affirming dismissal of securities fraud claim for failure to plead sufficient facts to support scienter requirement). They present no evidence, for example, that any of the Defendants sold Moore stock during the Class Period, which would have provided a motive to inflate Moore's stock price through deceit. Because there is no support for the general claim of fraud, the Court next examines each alleged misstatement or omission.

#### 1. *Before or During 1988*
##### a) *Laudatory Statements*

■ Plaintiffs claim that it is for a jury to decide whether these statements were materially misleading and whether Defendants had a duty to correct these allegedly materially misleading statements once it became apparent that West-ward was troubled. However, Plaintiffs have presented no evidence that West-ward was not in fact "highly regarded", or did not enjoy a "fine line of quality products."[5] Rule 10b–5 does not require that a mere expression of general enthusiasm be accompanied by a mountain of information to avoid being misleading:

> Were it to accept Plaintiff's argument, this Court would make extinct the typical one-page corporate press release and, in its place, require, for even the most mundane of announcements, a binder-full of financial and regulatory data commensurate with a mandatory SEC filing.

*Bragger v. Trinity Capital Enterprise Corp.,* 92 Civ. 2124, 1994 WL 75239 *4 (S.D.N.Y. Mar. 7, 1994) (dismissing complaint on grounds that general statement describing and expressing enthusiasm about proposed merger does not create duty to disclose even material information about companies merging). This result would defeat the intent of the Securities Exchange Act by swamping investors with more information, material and otherwise, than they could possibly digest. The Court thus finds that the general

---

4. The Second Circuit has held that recklessness can satisfy the *Ernst* scienter requirement of "intent" if defendants deliberately close their eyes to the facts. *See In re Fischbach Corp. Sec. Litig.,* 89 Civ. 5826, 1992 WL 8715, *6 (S.D.N.Y. Jan. 15, 1992); *see generally Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38 (2d Cir.), *cert. denied,*

439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

5. Whether Moore had a duty to disclose separately West-ward's losses once it became apparent that West-ward was losing money is a separate issue addressed below.

laudatory statements of which Plaintiffs complain created no duty to disclose more information concerning West-ward than was offered in the press releases.

Assuming, *arguendo*, that Defendants had a duty to disclose information about West-ward to prevent the laudatory statements from being misleading, the statements were immaterial as a matter of law. In analyzing the materiality element, the Court must consider the context in which the statements were made. *See McMahan*, 900 F.2d at 579. The statements objected to by Plaintiffs were brief expressions of enthusiasm contained in one-page press releases marking an agreement in principle between Moore and West-ward, the signing of a definitive agreement, and the completion of the acquisition. *See* Block Aff., Exs. 1, 3, 4. While the acquisition of West-ward certainly could have been material to a reasonable investor in Moore, the statements about West-ward could not be found to have significantly altered the "total mix" of information concerning Moore. *See TSC Industries*, 426 U.S. at 449, 450, 96 S.Ct. at 2132, 2132–33.

b) *Non-disclosure of Defendants' Lack of Experience Managing a Manufacturer of Pharmaceuticals*

■ Plaintiffs claim that Moore failed to reveal to investors that it had never managed a manufacturer of pharmaceuticals. *See* Pl. Mem. at 43. While Plaintiffs place great importance on the laudatory statements in Moore's press releases, they seem less inclined to focus on the admission, in those same statements, that the purchase "would mark Moore's initial investment into the manufacturing of generic pharmaceuticals." Block Aff., Ex. 3. *See also id.* at Ex. 4 (the acquisition of West-ward "represents the Company's [Moore's] first venture into the manufacture of generic pharmaceuticals.").

Moore fully disclosed its lack of experience managing a drug manufacturer in these press releases.

■ Plaintiffs also claim that these statements created a duty for Moore to disclose at a later date that West-ward was not well managed. *See* Pl.Mem. at 43. However, the statements concern only Moore's lack of experience, not the quality of West-ward's management. Thus, Moore had no duty to characterize West-ward's management.

c) *Non-disclosure of Moore's Capital Investment in West-ward*

■ Despite Plaintiffs' claim to the contrary, Defendants had no duty to disclose the amount of capital Moore invested in West-ward in its initial attempts to manufacture generic drugs. Defendants have presented uncontradicted expert testimony that they had no duty to disclose this information. *See* Deposition of Robert Cantor, November 17, 1993 ("Cantor Dep."), at 75, annexed as Ex. 58 to Block Aff.[6] In addition, Moore disclosed that West-ward was "under-capitalized," thereby implying that capital investment in West-ward was required. 1987 Annual Report, May, 1988, annexed as Ex. 10 to *id.*

d) *Non-disclosure of West-ward's Losses, Separate from Moore's*

■ Plaintiffs do not claim that Defendants failed to disclose that Moore Medical lost approximately $6.6 million in 1988 (*see* 1988 Form 10–K at 01393, annexed as Ex. 16 to *id.*),[7] including $495,000 of West-ward's operating losses. *See* West-ward 1988 Income Statement at 02418, annexed as Ex. 39 to *id.* Rather, Plaintiffs claim that Defendants acted fraudulently in failing to report West-ward's operating losses separately from Moore's. Again, Plaintiffs have presented no

---

**6.** Q: The question I'm trying to get to is to the extent that Moore Medical engaged in investing activities. Do you, in your opinion, believe there should have been further itemization or disclosure as to what the investing activities were ...?

A: No. Both my opinion and nothing in the literature would suggest that that should be done.

Mr. Cantor is a Certified Public Accountant and a partner at Ernst & Young LLP. See *id.*

**7.** Defendants claim that Moore lost $6.6 million in 1988. *See* Defendants' Memorandum of Law at 15; *see also* Defendants' Reply Memorandum at 6. However, the source to which Defendants cite, Moore's 1988 Form 10–K, reveals a loss of $6.136 million. Because Plaintiffs have not contested the $6.6 million figure, the Court uses this figure but notes the discrepancy.

evidence contradicting Defendants' expert's testimony that they had no duty to disclose separately West-ward's operating losses. *See* "Preliminary Report: Expert Analysis of Moore Medical Corporation Accounting Issues," by Robert Cantor, October 14, 1994, annexed as Ex. 37 to Block Aff. ("[I]t is my opinion that Moore Medical Corp. complied in its public disclosures concerning West-ward with the applicable financial reporting and disclosure requirements under GAAP and SEC regulations."). This is not to say that companies need never report separately the results of their subsidiaries, even of small subsidiaries. Rather, on the basis of undisputed expert testimony, the Court concludes that under the relevant regulations *this* company had no duty to report separately the results of *this* subsidiary.[8] Thus, there is no genuine factual dispute on this issue, and nothing for a jury to decide.[9]

### e) *Non-disclosure of the FDA "Recipe Issue"*

Plaintiffs claim that Defendants failed to disclose material information concerning the cessation of manufacturing at West-ward while it awaited FDA approval of the 'recipes' for the drugs it produced. *See* Pl.Mem. at 10–11. After acquiring West-ward, Defendants discovered that West-ward was not in compliance with some FDA requirements; West-ward halted production for over a month, destroyed inventory, re-

called products that did not meet FDA specifications, and hired a consultant to assure FDA compliance. *See* Deposition of Weisberg, December 10, 1993 ("Weisberg Dep."), at 67–68, 84, 92–94, annexed as Ex. 73 to Block Aff. Defendants disclosed in April of 1988 that West-ward's "operations are expected to start in 1988 when Food and Drug Administration approvals are obtained." *Id.* at Ex. 7 at 4.[10] Defendants also disclosed:

> An independent expert has evaluated the procedures and formulations of certain [West-ward] products and has found deficiencies and deviations from the approved applications of these products with the Food and Drug Administration ... It is not possible at the present for the Company to predict the outcome or range of the potential loss, if any, that might arise from the matter.

Form 8, Amendment 1 at 02914, annexed as Ex. 6 to Block Aff. These statements clearly inform investors that West-ward had yet to obtain FDA approval to manufacture drugs, satisfying any duty to disclose.[11] In addition, Moore received $1.87 million from the sellers of West-ward to compensate for losses stemming from the FDA recipe problem. *See* Settlement Agreement, February 16, 1989, annexed as Ex. 58 to Block Aff. Thus, even if Defendants had not disclosed the FDA problems, Plaintiffs offer no evidence that the problems were material to investors once Moore recovered from the original sellers.[12]

---

**8.** Under GAAP requirements, an enterprise must report separately its results in different industries, or "segments" of the enterprise. *See* Block Aff., Ex. 37 at 6 (citing FASB Statement 14, Financial Reporting for Segments of a Business Enterprise). "[D]etermination of an enterprise's industry segments must depend to a considerable extent on the judgment of the management of the enterprise." *Id.* In Mr. Cantor's uncontradicted expert opinion, "Moore's judgment to include West-ward not as a discrete segment but as a part of its existing single segment, without separate disclosure of West-ward's operating results, was appropriate and fully in compliance with GAAP." *Id.*

**9.** Because the Court concludes as a matter of law that West-ward's losses were not required to be disclosed separately from Moore's losses, the Court need not address the question of whether this information would have been material to a reasonable investor in Moore.

**10.** West-ward did begin production in 1988. *See* Weisberg Dep. at 92–94.

**11.** Plaintiffs claim that the "if any" clause of the above quotation renders the statement "false and misleading" because Defendants already knew that there were losses such as destroyed inventory and product recalls resulting from the failure to comply with FDA requirements. *See* Pl.Mem. at 46–47. This claim, based on an unduly narrow reading of the statement, is without merit. The quotation adequately discloses to the investing public the existence and nature of West-ward's FDA compliance troubles.

**12.** Plaintiffs claim that because Defendants originally had sought over $4 million but recovered only $1.87 million, Moore suffered a material loss due to the FDA compliance trouble. *See* Pl.Mem. at 11, 46. However, statements made in compromise negotiations are inadmissible, *see* Fed.R.Evid. 408, and therefore cannot be consid-

672

## 2. *In 1989*

### a) *The Four Encouraging Statements*

 While Plaintiffs claim that the statements at issue predict that West-ward would soon gain profitability (*see* Pl.Mem. at 48), only one concerns West-ward's profitability. Statements (i) and (ii) refer to Moore, not West-ward. In light of Moore's one-time fourth quarter loss totalling $12.4 million involving Moore's latex glove inventory, computer problems, and litigation unrelated to the instant case, *see* Block Aff., Ex. 15, Plaintiffs have offered no evidence that these predictions regarding Moore's 1989 performance were misleading. Statement (iii) predicts only increased sales growth, not profitability, for West-ward. Plaintiffs have offered no evidence that West-ward did not enjoy increased sales in the third quarter of 1989.

 Statement (iv), on the other hand, does express optimism about West-ward's future profitability.[13] Plaintiffs contend that this public prediction of profitability constitutes a material misstatement for which Defendants lacked a reasonable basis. *See* Pl.Mem. at 48. For a general statement of optimism to be actionable, Plaintiffs must demonstrate that the opinion was not honestly held. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 266 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994). Plaintiffs offer only an internal memorandum in which Defendant Murray wrote:

> The West-ward budget is a real stretch. The sales budget is extremely aggressive. The gross profit depends on not reducing sales prices to get the sales growth and also on more than double the 1989 production without much increase in manufactur-

ing expenses. Both are optimistic assumptions ... While I believe progress can be made at West-ward in 1990, I do not believe the budget is achievable.

Interoffice Memo dated January 16, 1990, annexed as Ex. 19 to Affidavit of Robert Harwood, Attorney for Plaintiffs, March 10, 1995 ("Harwood Aff."). This statement does not support Plaintiffs' claim that Defendants knew that there was no reasonable basis for statement (iv). The memo reveals only that Murray doubted that West-ward would meet budget, not that he believed West-ward could not turn a profit.

The memo does not question the existence of a reasonable basis for the budget. As the Second Circuit has noted recently, "misguided optimism is not a cause of action, and does not support an inference of fraud." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir.1994) (affirming dismissal of securities fraud action for failure to plead necessary elements of fraud with sufficient particularity). As Plaintiffs have failed to offer any evidence demonstrating that Defendants did not believe the projections of the December, 1989, "Turnaround Plan" that supported their optimism, (*see* West-ward Turnaround Plan, annexed as Ex. 44 to Block Aff.),[14] summary judgment is appropriate.

 Even assuming that Plaintiffs had presented evidence showing Defendants had no reasonable basis for their optimism regarding West-ward, Plaintiffs have not demonstrated that a jury could find the statement materially misleading to a reasonable investor in Moore. Summary judgment on the issue of materiality is appropriate if "reasonable minds could not differ as to whether the undisclosed facts would be important to a

---

ered by this Court on a motion for summary judgment. Fed.R.Civ.P. 56. *See, e.g., Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir.1992).

**13.** While this statement comes from the 1989 Annual Report issued on April 30, 1990, Plaintiff included it in the 1989 section because it concerns West-ward's 1989 performance.

**14.** The Turnaround Plan identified seven steps that had to be taken to make West-ward profitable, and predicted that West-ward could achieve profitability by May of 1990 if the prescribed

measures were implemented. See *id.* While Plaintiffs have relied on hyperbole in characterizing the Plan as "fanciful", "phony", and "hallucinatory", Pl.Mem. at 16, 48, West-ward's sales totals for the first quarter of 1990 were only 1.3% off the budgeted sales target and its operating loss in March was only $6,000, which was well below the $33,000 loss budgeted. *See* 1990 Monthly Financials at WW 00784–85, annexed as Ex. 49 to Harwood Aff. These positive results seeming to bear out the Plan strongly support Defendants' claim that they had a reasonable basis for the prediction of profitability offered in the 1989 Annual Report.

reasonable investor." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985).

In making the determination, the Court must analyze the context and language of the statement. In considering the context of the statement, I first note the relationship between Moore and West-ward. Materiality is determined "in light of the totality of the company activity." *Basic*, 485 U.S. at 238, 108 S.Ct. at 987. West-ward was a small subsidiary of Moore Medical; while Moore acquired West-ward for $6.4 million, Moore possessed over $81 million in total assets by the end of 1988. *See* Block Aff., Ex. 16 at WW 01381. West-ward's 1989 sales accounted for approximately three percent of Moore's 1989 total sales of over $272 million. *See* 1989 Form 10–K, annexed as Ex. 25 to Block Aff. While West-ward's effect on Moore's earnings per share could have been material to a reasonable investor, defendants disclosed this information in the 1989 Form 10–K. *See id.*[15]

The context in which the statement was made is also important. The limited prediction of profitability concludes a paragraph in which Defendants admitted that "West-ward has been a greater challenge than we had anticipated ... this process has been slower and more expensive than we would have liked ..." *Id.* at Ex. 26 at WW 01246. The paragraph notes West-ward's prior problems with production and inventory. The prediction of profitability is tempered by these adjacent disclosures. The statement does *not* offer any guarantee of profitability, nor does it set specific benchmarks it claims will be met.

This general statement of optimism, preceded by a discussion of West-ward's problems and expressed in guarded terms, cautions investors that the prediction is not a guarantee. "It is well recognized that statements that include such cautionary language are usually 'not the stuff of which securities fraud claims are made.'" *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 218 (4th Cir.1994) (quoting *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir.1986)); *see also In re*

*Donald J. Trump Casino Sec. Lit.*, 7 F.3d 357, 364 (3d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994) (it is a "well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law").

The whole discussion of growth is plainly by way of loose prediction ... No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market. Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen. The market gives most credence to those predictions supported by specific statements of fact, and those statements are, of course, actionable if false or misleading. However, projections of future performance not worded as guarantees are generally not actionable under the federal securities laws.

*Raab v. General Physics Corp.*, 4 F.3d 286, 290 (4th Cir.1993) (citing *Friedman v. Mohasco Corp.*, 929 F.2d 77 (2d Cir.1991)). The statement at issue here is a general expression of optimism concerning a small subsidiary, following a discussion of the subsidiary's problems; it is immaterial as a matter of law.

b) *Non-disclosure of Moore's Continued Capital Investment in West-ward*

Plaintiffs claim that Defendants' failure to disclose Moore's continued investment in West-ward was a materially misleading omission. *See* Pl.Mem. at 49. However, as noted above at p. 14, Defendants have presented uncontradicted expert testimony that they had no duty to disclose this information. *See* Block Aff., Ex. 37. "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic*, 485 U.S. at 239, n. 17, 108 S.Ct. at 987, n. 17.

c) *Non-disclosure of West-ward's Losses in Moore's 1989 Forms 10–Q*

Plaintiffs argue that Defendants' failure to disclose West-ward's losses separately from

---

**15.** West-ward was responsible for a $.46 per share loss in the value of Moore Medical in 1989.

*See id.*

Moore's in Moore's 1989 quarterly filings with the SEC was materially misleading, diverting investors' attention from the losses at West-ward. *See* Pl.Mem. at 14–16, 50–51. Defendants offer uncontroverted evidence that they disclosed West-ward's results separately from Moore's in Moore's 1989 10–K, *see* Block Aff., Ex. 25, and informed the public in both a press release and the 1989 Annual Report that West-ward suffered "continuing losses" and "operated at a loss for the year." *Id.* at Exs. 24, 26. These disclosures are hardly consistent with Plaintiffs' allegations of reckless behavior. Of equal importance, Plaintiffs again offer no evidence disputing Defendants' expert testimony that there was no duty to disclose West-ward's results separately from Moore's. *See* Block Aff., Ex. 37. "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic,* 485 U.S. at 239, n. 17, 108 S.Ct. at 987, n. 17.

### 3. *In 1990*

#### a) *Defendants' Statement Concerning Moore's Regulatory Compliance*

■ Defendants' statement in Moore's 1989 Form 10–K that they believed that Moore was in material compliance with all regulations, including those of the FDA, was not materially misleading despite the FDA inspection of West-ward in December 1989–January 1990. The mere fact of an FDA inspection is not material; such inspections represent a routine aspect of business. *See Acito,* 47 F.3d at 53. Moreover, when Defendants made the statement on March 30, 1990, they had a reasonable basis for believing that

the results of the FDA inspection were immaterial to Moore. The inspection had revealed a need for West-ward to spend an estimated $130,000 to comply with FDA "validation" requirements. *See* Interoffice Memorandum dated February 23, 1990, annexed as Ex. 42 to Block Aff. When it issued the 1989 Form 10–K, Moore was addressing the validation problem raised by the FDA inspection of West-ward, and reasonably believed the cost of compliance would be only $130,000.[16] Because the fact of an FDA inspection is not material, *see Acito,* 47 F.3d at 53, and Defendants reasonably believed that compliance costs resulting from the inspection were minimal, it was neither false nor materially misleading to state on March 30, 1990, that Moore believed it was in material compliance with the relevant regulations.[17]

#### b) *Failure to Disclose Defendants' Attempts to Sell West-ward*

■ Plaintiffs do not dispute that Defendants disclosed on November 8, 1990, that "we are considering various alternatives regarding our investment in West-ward, including the sale of the entire business." Press Release dated November 8, 1990, annexed as Ex. 31 to Block Aff. Plaintiffs claim, however, that Defendants should have made this disclosure by May, 1990, when the possibility was explored preliminarily at the Annual Meeting of the Board of Directors. *See* Pl. Mem. at 52.[18] The Court finds that Defendants had no duty to disclose their preliminary consideration and preparation for selling West-ward prior to the November 8 announcement.

---

**16.** Implementing the validation agreement ultimately became more costly than Defendants had anticipated, as FDA warnings forced West-ward to halt production for a month. *See* Weisberg Dep. at 145. However, Plaintiffs have offered no evidence that Defendants foresaw this difficulty. Nor did Defendants have or violate any duty to correct the statement. The statement is a simple description of Moore's regulatory status as of March 30, 1990; it offers no assurance of continued compliance.

**17.** Plaintiffs point to no evidence suggesting that Moore (or West-ward) had FDA problems in 1989 or the first quarter of 1990 other than the validation issue.

Plaintiffs also claim that Defendants' statement that "[w]e believe that the major drug recalls and product withdrawals of certain generic drug

manufacturers are substantially over ..." Block Aff., Ex. 29, was misleading because of continuing product recalls at West-ward. Plaintiffs have failed to offer any facts showing product recalls from West-ward in August, 1990. More importantly, the statement, when read in context, refers not to West-ward but to the manufacturers who supplied Moore with drugs for distribution. *See id.*

**18.** At the Annual Meeting, Defendant Kotler requested that Defendant Murray prepare a preliminary disposition analysis of West-ward and develop preliminary projections of how Moore would fare without West-ward. *See* Board Minutes of May 23, 1990, annexed as Ex. 53 to Harwood Aff.

Defendants' expert testified at deposition that Moore had no duty to disclose the possibility of selling its West-ward subsidiary until March 6, 1991, when the Board committed itself to selling West-ward. *See* Cantor Dep. at 134–136 (stating that there is no disclosure required until the Board offers a resolution committing itself to the sale). Plaintiffs rely on *Kronfeld v. Trans World Airlines, Inc.,* 832 F.2d 726 (2d Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988), in claiming that the trier of fact must determine whether the knowledge of the potential sale of a subsidiary would have been material. However, *Kronfeld* involved a situation readily distinguishable from the instant case. In *Kronfeld,* the parent company (TWC) had addressed publicly the status of its relationship with a subsidiary (TWA) but had omitted information concerning the possibility it would sell TWA. The Second Circuit held that the District Court did not have sufficient grounds for finding that the omitted information was immaterial to shareholders of TWA. Rather, the Court found that the issue of materiality should have been decided by a trier of fact. The Court specifically noted that "we do not address here a pure question of a duty to disclose." *Kronfeld,* 832 F.2d at 732.[19]

Here, the Court faces a pure question of duty to disclose. No statute or regulation required that Defendants reveal their consideration of selling West-ward before they actually decided to do so in November of 1990. *See* Cantor Dep. at 134–136 (stating that there is no disclosure required until the Board offers a resolution committing itself to the sale). Moreover, unlike TWC in *Kronfeld,* they had made no previous statements that may have been misleading absent disclosure of the decision to explore the sale of their subsidiary. Plaintiffs have failed to identify evidence creating a "genuine dispute" about whether Defendants had a duty to disclose between May and November of 1990 that they were considering selling West-ward. Because Defendants had no duty to disclose, there is no need for a trier of fact to decide whether the alleged omission was material.

#### c) *Statements Concerning West-ward's Sales*

Plaintiffs claim that Defendants' reporting of West-ward's sales increases created a duty to disclose that West-ward continued to operate at a loss, and that failure to disclose West-ward's operating losses constituted a material omission. *See* Pl.Mem. at 54–55. Defendants reported that West-ward's sales had increased by "about 75%" in the first quarter of 1990, Press Release dated May 3, 1990, annexed as Ex. 27 to Block Aff., and by 89% in the second quarter. *See* Form 10–Q, filed August 13, 1990, annexed as Ex. 30 to *id.*[20] In the second quarter 10–Q, Defendants reported that "[n]et income per share decreased 45% ... The increased net losses from West-ward accounted for most of the decline." *Id.* at WW 00168. The sole basis for Plaintiffs' claim, then, is that Defendants did not disclose the same information in the first quarter 10–Q. Whether or not it might have been material to a reasonable investor, Plaintiffs have presented no evidence disputing Defendants' expert testimony that Moore had no duty to disclose West-ward's losses separately. *See id.* at Ex. 37. Thus, the omission is not actionable under § 10(b).

Because Defendants' motion for summary judgment is granted with regard to Plaintiffs' claims under § 10(b), Plaintiffs cannot establish a necessary element of a § 20(a) claim. Therefore, the Court grants Defendants' motion for summary judgment on Plaintiffs' claims under § 20(a) as well.

### III. *CONCLUSION*

For the reasons stated above, Defendants' motion for summary judgment is granted.

SO ORDERED.

---

**19.** *Kronfeld* involved an alleged violation of § 11 of the Securities Exchange Act of 1934. The Circuit noted that the two-step analysis followed in § 10(b) cases such as the instant case—focusing first on the duty to disclose and then on materiality—is not appropriate in § 11 cases. *See Kronfeld,* 832 F.2d at 730, n. 8.

**20.** Plaintiffs do not challenge the veracity of these figures.